07-4375-cv
Byrne v. Rutledge

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: December 8, 2008                    Decided: October 8, 2010)

Docket No. 07-4375-cv

————————

SHAWN W. BYRNE,

*Plaintiff-Appellant*,

– v.–

BONNIE RUTLEDGE,
IN HER OFFICIAL CAPACITY AS VERMONT COMMISSIONER OF MOTOR VEHICLES,
AND DAVID DILL,
IN HIS OFFICIAL CAPACITY AS VERMONT SECRETARY OF TRANSPORTATION,

*Defendants-Appellees.*

————————

Before:  KEARSE, RAGGI, and LIVINGSTON, *Circuit Judges.*

————————

Plaintiff-Appellant Shawn Byrne filed this action alleging that Vermont's denial of his requested vanity license plate, on the grounds that it contained a religious message in violation of state law prohibiting such messages on vanity license plates, violated the Free Speech Clause, the Equal Protection Clause, and the Due Process Clause of the U.S. Constitution. He sought nominal damages and injunctive and declaratory relief. Magistrate Judge Jerome J. Niedermeier recommended granting Vermont's motion for summary judgment and denying Byrne's summary judgment motion, a recommendation that District Judge J. Garvan Murtha adopted, entering

1

judgment for Defendants-Appellees. We hold that the statute impermissibly restricts expression from a religious viewpoint and thus violates the Free Speech Clause of the First Amendment to the U.S. Constitution. Moreover, we conclude that, as applied to Byrne, the statute is similarly infirm, and, therefore, we reverse the judgment of the district court.

REVERSED AND REMANDED.

————————

JEREMY D. TEDESCO, Alliance Defense Fund, Scottsdale, Ariz., (Benjamin W. Bull, David A. Cortman, Jeffrey A. Shafer, Kevin Theriot, Alliance Defense Fund; Anthony R. Duprey, Neuse, Smith & Venman, *on the brief*) *for Plaintiff-Appellant*.

EVE JACOBS-CARNAHAN, Assistant Attorney General (Bridget Asay, Assistant Attorney General, *on the brief*), *on behalf of* William H. Sorrell, State of Vermont, Attorney General, Montpelier, Vt., *for Defendants-Appellees*.

————————

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Vermont, like many states, allows the owners of motor vehicles to request a "special number" license plate — more commonly known as a "vanity" plate — that contains a short message selected by the registrant rather than the generic combinations of letters and digits that the state Department of Motor Vehicles ("DMV") would otherwise assign. While Vermont allows residents to select combinations that convey messages on a variety of topics, including statements of personal philosophy and taste, inspirational messages, and statements of affiliation with or affirmation of entities, causes, and people, the state does not permit any "combination[] of letters or numbers that refer, in any language, to a . . . religion" or "deity." Vt. Stat. Ann. tit. 23, § 304(d)(4).

2

In April 2004, plaintiff-appellant Shawn Byrne applied for plate "JN36TN," which he intended as a reference to the often-quoted Biblical verse, John 3:16. The state denied his application on the ground that the requested plate referred to religion in violation of state law. Byrne then commenced this suit in the United States District Court for the District of Vermont, contending that the state's denial violated his First and Fourteenth Amendment rights. By order dated September 28, 2007, the district court (Murtha, *J.*) adopted the reasoning of Magistrate Judge Jerome J. Niedermeier and granted summary judgment in favor of defendants-appellees. Relying principally on this Court's decision in *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001), the district court found that the state law constituted a permissible viewpoint-neutral and reasonable regulation on speech in a "nonpublic forum."

Because we conclude that Vermont's ban on all vanity plate combinations that "refer, in any language, to a . . . religion" or "deity" constitutes unconstitutional viewpoint discrimination and, moreover, is unreasonable as applied to Byrne's application, we reverse.

## BACKGROUND

Vermont requires residents to register operative motor vehicles with the state Department of Motor Vehicles ("DMV") and directs the DMV Commissioner to assign to each registered vehicle "a distinctive number" along with "a number plate or plates showing the assigned number." Vt. Stat. Ann. tit. 23, § 304(a). For an additional fee, Vermont allows registrants to select that "assigned number" themselves by requesting a "special number" or vanity license plate. Vermont law provides that registrants requesting such a plate may select virtually any combination of up to seven letters or numbers provided that the selected combination has not previously been assigned to another vehicle and that it complies with certain other technical requirements. *Id.* § 304(d).

3

Pursuant to this Vermont law, the state DMV has issued tens of thousands of vanity plates to state motorists – as of 2006, Vermont had more than 38,000 active vanity plates, and was processing about 100 applications per week – each containing a personal message selected by the motorist. Popular subjects on which motorists have chosen to express themselves include personal interests or professional pursuits – e.g., BUTCHER, BKEEPER, LUV2FSH, GOYANKS; personal philosophies and beliefs – e.g., HARMONY, LOVE, EARTH1, AMFREE; meaningful exhortations or inspirational messages – e.g., PEACE2U, LOVLIFE, THNKPOS, CARP DM, BEJOYFL, DARE2BU, REJOICE; and statements of love, respect, and gratitude for important individuals in the motorist's life – e.g., THXDAD, ILUVLYN, MI3SONS, MISUDAD.

While state motorists thus can and do use vanity plates to comment on a wide variety of topics, state law prohibits the Commissioner from issuing special plates if the proposed combination of letters and numbers falls into one of seven categories.[1] Of these various prohibitions, which

---

[1] The statute provides as follows:

> The commissioner may revoke any plate described in subdivisions (1) through (7) of this subsection and shall not issue special number plates with the following combination of letters or numbers:
>
> (1) Combinations of letters or numbers with any connotation, in any language, that is vulgar, derogatory, profane, racial epithets, scatological or obscene.
> (2) Combinations of letters or numbers that connote, in any language, breast, genitalia, pubic area, or buttocks or relate to sexual or eliminatory functions. Additionally, "69" formats are prohibited unless used in combination with the vehicle make, for example, "69 CHEV."
> (3) Combinations of letters or numbers that connote, in any language:
>> (A) any illicit drug, narcotic, intoxicant, or related paraphernalia;
>> (B) the sale, the user, or the purveyor of such substance;

4

include bans on combinations that are "vulgar, derogatory, profane . . . or obscene" or those that "connote . . . any illicit drug," Vt. Stat. Ann. tit. 23, § 304(d)(1), (3)(A), only one is challenged in this action. At issue here is the state ban on any combination that "refer[s], in any language, to a . . . religion" or "deity." *Id.* § 304(d)(4). The asserted purpose of the ban is to avoid the "distraction and disruption [that would] result[] from controversial speech" and to "disassociat[e] the State from speech" it does not endorse. Respondents' Br. at 31, 33.

Defendants have interpreted the statute as requiring a ban on any combination with religious "meaning" and contend that they are thus authorized to ban not only those plates that overtly and obviously reference religion – *i.e.*, those the state refers to as "objectively religious" – but also those plates that are meant by the registrant to embody a religious meaning no matter how cryptic the

---

> (C) the physiological state produced by such a substance.
> (4) Combinations of letters or numbers that refer, in any language, to a race, religion, color, deity, ethnic heritage, gender, sexual orientation, disability status, or political affiliation; provided, however, the commissioner shall not refuse a combination of letters or numbers that is a generally accepted reference to a race or ethnic heritage (for example, IRISH).
> (5) Combinations of letters or numbers that suggest, in any language, a government or governmental agency.
> (6) Combinations of letters or numbers that suggest, in any language, a privilege not given by law in this state.
> (7) Combinations of letters or numbers that form, in any language, a slang term, abbreviation, phonetic spelling or mirror image of a word described in subdivisions (1) through (6) of this subsection.

Vt. Stat. Ann. tit. 23, § 304(d). Implementing regulations restate the exclusions above, referring to them as "a non-exhaustive list of combinations that will not be issued." 14-050-025 Vt. Code. R.§ 16(I)(f).

A previous version of the statute, which authorized the Commissioner to "refuse to honor any request that might be offensive or confusing to the general public," was invalidated by Vermont's Supreme Court in 2003. *See Martin v. State*, 819 A.2d 742, 750 (Vt. 2003). Vermont's legislature then enacted the current statute which was applied to Byrne's application.

combination of letters and numbers might seem to a casual observer. The state refers to vanity license plates of the latter sort as "subjectively religious." Respondents' Br. at 6-7. To effectuate this broad ban, the Vermont DMV requires motorists seeking vanity plates to complete sworn applications in which they state what a proposed combination "represent[s]" to them. Applications for vanity plates are then reviewed by various DMV clerks who determine whether the proposed combination refers to a religion or deity (or violates any of the other statutory exclusions). According to the state, clerks rely on their own personal knowledge, the registrant's supplied meaning, and, at times, the advice of the department's general counsel. All plates approved by DMV clerks are then forwarded to the Department's Director of Operations and General Counsel for final review and approval before the plates are issued. Applicants whose combinations are rejected have the right to appeal those denials through the state Agency of Transportation.

While the stated goal of this administrative process is to effectuate the statutory ban on any "refer[ence]" to religions or deities, the record indicates that, in practice, the process – and specifically, Vermont's policy of looking to "supplied meaning" – has led to somewhat confounding results. Respondents' Br. at 36. Pursuant to this process, Vermont has denied, as "objectively religious," applications for the combinations SEEKGOD, 1G0D, THE REV, and KRISHNA, but it has repeatedly permitted combinations that might appear to a third party to "refer" to a religion or deity on the ground that the motorist supplied a secular meaning for the combination.[2] For

---

[2] While the record contains hundreds of vanity plate applications submitted over the course of more than a decade, the parties dispute which of them we should consider on appeal. Specifically, the state contends that we should consider only those applications submitted after May 2004, when the statute at issue here took effect. Byrne contends that we should also consider applications submitted under the predecessor law. We need not resolve this issue because, confining our review to license plates issued after the effective date of the current law, we conclude that the district court's judgment must be reversed.

example, the state has issued plates bearing the combinations GEMINI and LIBRA because they were explained as references to a motorist's "astrological" or "zodiac" sign; GENESIS and CREED as references to a motorist's favorite musical group; STJOHN as a reference to the U.S. Virgin Island; PSALM as a reference to "a song"; SINNER as a reference to "my life"; and ANGEL1, ANGEL21, ANGEL23, and ANGELSC as references to a motorist's "nickname" or a child's name. Similarly, the state has permitted the combinations BUDDHA (explained as a reference to a "nickname"); GODDESS (a "nickname [and] screen-name"); BLESSED ("because I'm blessed"); and KALI ("Our horse[']s name"),[3] even though a third party with no prior knowledge of the applicant's intended meaning might well interpret those plates as referring to religion and thus as the very sort of "controversial speech" the statute ostensibly seeks to prevent.

Vermont's practice of looking to a registrant's supplied meaning has also led the state to reject combinations that are "objectively meaningless" and that would be unlikely to strike casual observers as a reference to anything, let alone religion. For example, the state rejected the plate BVM22 because it was explained by the registrant as a reference to "Blessed Virgin Mary Perfection" and the plate JMJ1 because the registrant intended it as a reference to "Jesus, Mary, Joseph 1." Vermont has struggled to explain how these denials are consistent with or in furtherance of the statute's averred purpose, arguing before this Court simply that such denials are necessary to avoid the unfairness that might result from allowing some motorists to make religious references simply because their chosen references are obscure.[4]

---

[3] Kali is "the name given to the Hindu mother-goddess . . . in her most terrible form as goddess of destruction and death." The Oxford English Dictionary Vol. III 343 (2d ed. 1991).

[4] Adding to the confusion, Vermont concedes that it has made "mistakes" in processing applications and has erroneously issued plates that do not comply with the statute as interpreted by the Commissioner, such as ATHENA (explained as a reference to the "Greek Goddess of

7

Byrne applied for the plate that gives rise to this litigation on April 20, 2004, requesting the combination JN36TN and explaining that it "represent[ed]" a "Bible passage."[5] The parties agree that Byrne subjectively intended to refer to John 3:16, which states, "For God so loved the world, that he gave his only begotten Son, that whosoever believeth in him should not perish, but have everlasting life." *John* 3:16 (King James). Byrne contends, and the record supports the conclusion that, the combination JN36TN might have been permissible if his supplied meaning had been secular – for example, if he had put on his application that "[m]y name is John, I am 36, [and] I was born in Tennessee."

On May 14, 2004, the DMV rejected Byrne's application because it requested "a combination that refers to [a] deity." Byrne appealed that denial to the state Agency of Transportation, which held a hearing on Byrne's application on July 1, 2004, at which Byrne appeared and was represented by counsel. The hearing officer concluded that the denial was "appropriate and proper," noting that the DMV "does not issue its plates with a combination of letters and numbers that refer to any religion."

Byrne then commenced this action, alleging that the denial violated his First and Fourteenth Amendment rights. The district court rejected those claims, adopting the recommended findings of a magistrate judge that vanity license plates constitute a "nonpublic forum" and that the statutory

---

Wisdom") and AGAPE77 ("Greek word for love, representing God's unconditional love"). The state also concedes that certain religious terms that it considers "secularized" might be permissible under the law and, accordingly, that combinations such as HOPE, PEACE, or GRACE could be issued.

[5] Byrne alternatively requested the combinations JOHN316 and JN316, which he similarly intended as references to the Biblical passage John 3:16. Because all parties agree that the combinations could not be issued for technical reasons of no relevance to this litigation, we do not consider them further.

restrictions at issue are viewpoint-neutral, reasonable restrictions on speech within such a forum. Accordingly, the district court adopted the magistrate judge's recommendation that summary judgment be granted in favor of defendants. This appeal followed.

## DISCUSSION

We review *de novo* a district court's grant of summary judgment, *Pilgrim v. Luther*, 571 F.3d 201, 204 (2d Cir. 2009), and we affirm only where we are able to conclude, after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, that "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). Where, as here, cross motions for summary judgment are filed, we "'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

## I

It is well established that "the government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); *Perry*, 280 F.3d at 166. Instead, under the prevailing constitutional framework, speech restrictions imposed on government-owned property are analyzed under a "forum-based" approach that divides government property into three categories – the traditional public forum, the designated public forum, and the nonpublic forum.[6] *Perez v. Hoblock*, 368 F.3d 166, 172-73 (2d Cir. 2004)

_____

[6] As discussed further *infra* note 8, the law of this Court and the Supreme Court also occasionally speaks of a "limited public forum." *See, e.g.*, *Good News Club v. Milford Cent.*

9

(collecting authorities). Because, "[a]s a general matter . . . the degree of control" the government may exercise over speech "depends upon the nature of the property," *Hotel Employees*, 311 F.3d at 544, the "initial task" for a court evaluating restrictions placed on speech or expressive conduct on government property "is to define the nature of the property at issue." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010).

The first two types of fora – the traditional public forum, and the designated public forum – are those open to the public, either through traditional use or purposeful government designation, for all types of expressive activity. Virtually all regulations on speech in these fora are subject to the highest level of First Amendment scrutiny. *Perez*, 368 F.3d at 172. The third category, the nonpublic forum, consists of property that is not traditionally open to the public and that the government has not opened for expressive activity by members of the public. Property falling into this third category includes airport terminals, military bases, prisons, and similar properties. *Id.* at 172-73. In a nonpublic forum, the government has "maximum control over communicative behavior," *Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991), and a government restriction on speech in a nonpublic forum will be upheld so long as the restriction is reasonable and viewpoint-neutral, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 800 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

Applying our decision in *Perry v. McDonald*, the district court concluded that Vermont's license plates constitute a "nonpublic forum." No party seriously challenges that finding on appeal.[7]

---

*Sch.*, 533 U.S. 98, 106 (2001); *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks and Recreation*, 311 F.3d 534, 545-46 (2d Cir. 2002).

[7] Respondents do contend for the first time on appeal that vanity license plates "should be treated as government speech," and, as such, exempt from forum-based First Amendment scrutiny. Respondents' Br. at 39-40. This position was never advanced before the district court

*Perry* involved a challenge to the predecessor to the Vermont statute at issue here. This Court concluded in *Perry* that "vanity plates are a highly limited and extremely constrained means of expression," that Vermont had not created a public forum by permitting the discourse possible on vanity plates, and that, accordingly, "a Vermont vanity plate is a nonpublic forum." *Perry*, 280 F.3d at 168-69. While there have been changes to the Vermont vanity plate program since *Perry* was decided, none of these changes are material to the forum analysis, and no party identifies a basis for concluding that *Perry* is not controlling. Consequently, we follow *Perry*, *see United States v. Brutus*, 505 F.3d 80, 87 n.5 (2d Cir. 2007), and analyze the Vermont vanity plates as a nonpublic forum.

## II

As noted above, the government enjoys greater latitude in restricting speech in a nonpublic forum and may limit access or content "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806; *Perry* 280 F.3d at 169 ("[W]e will uphold a governmental restriction on speech in a nonpublic forum as long as the restriction is reasonable and viewpoint-neutral."). Here, the district court concluded that Vermont's prohibition on any reference to a religion or deity on vanity license plates is both "viewpoint neutral" and "reasonable" in light of the purpose served by the forum. We disagree.

In evaluating viewpoint neutrality within the context of a nonpublic forum, two guiding

---

and accordingly will not be considered. *See Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005) ("'[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.'" (quoting *Greene v. United States*, 13 F. 3d 577, 586 (2d Cir. 1994))). Moreover, the argument, which is supported by no controlling authority, is foreclosed by this Court's decision in *Perry*. *See Perry v. McDonald*, 280 F.3d 159, 168-69 (2d Cir. 2001).

principles emerge. First, the government may permissibly restrict content by prohibiting *any* speech

on a given topic or subject matter. *See, e.g.*, *Good News Club v. Milford Central School*, 533 U.S.

98, 106 (2001) ("The State may be justified 'in reserving [its forum] for certain groups or for the

discussion of certain topics.'" (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S.

819, 829 (1995)) (alteration in original))[8]; *Perry*, 280 F.3d at 170 (ban on "scatalogical subjects"

permissible); *Choose Life Ill., Inc., v. White*, 547 F.3d 853, 865 (7th Cir. 2008) (state may properly

"exclude[] the *entire subject* of abortion from its specialty-plate program" (emphasis in original)).

Second, however, once the government has permitted *some* comment on a particular subject matter

or topic, it may not then "regulate speech in ways that favor some viewpoints or ideas at the expense

of others." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)

(quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). Accordingly,

while "a speaker may be excluded from a nonpublic forum if he wishes to address a topic not

encompassed within the purpose of the forum . . . the government violates the First Amendment

---

[8] In both *Good News Club* and *Rosenberger*, the Court described the fora at issue as a "limited public forum," a term that, as several of our sister circuits have observed, "'has been used in different ways.'" *Bowman v. White*, 444 F.3d 967, 975 (8th Cir. 2006) (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 n.4 (1st Cir. 2004)). Indeed, the law of this Court describes a "limited public forum" as both a "subset of the designated public forum" and a "nonpublic forum" opened to "certain kinds of speakers or to the discussion of certain subjects." *Hotel Emps. & Rest. Emps. Union*, 311 F.3d at 545. We need not and do not attempt here to further clarify the distinction, if any, between a "limited public forum" and the three more commonly recognized categories of fora utilized in First Amendment analysis because it is sufficient, for purposes of this discussion, to note that in both *Good News Club* and *Rosenberger*, the Court evaluated the restrictions at issue under the same standard applicable to restrictions on speech in a nonpublic forum – i.e., the restriction "must not discriminate against speech on the basis of viewpoint . . . and . . . [must] be reasonable in light of the purpose served by the forum." *Good News Club*, 533 U.S. at 106-07 (internal citations, quotations omitted); *see also Rosenberger*, 515 U.S. at 829 ("The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum . . . nor may it discriminate against speech on the basis of its viewpoint." (internal citations, quotations omitted)). Accordingly, we treat the First Amendment analysis in both cases as directly relevant to our inquiry here.

when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806.

Vermont contends, and the district court found, that the statute in question can be understood as a permissible ban on a topic or subject matter – religion. Byrne, in contrast, argues that the law amounts to unconstitutional viewpoint discrimination because it bars expression on otherwise permissible topics such as personal philosophy or beliefs solely on the basis of its religious perspective. While distinguishing between a "subject matter" and a "viewpoint" can be difficult, *see Giebel v. Sylvester*, 244 F.3d 1182, 1188 n.10 (9th Cir. 2001), our task here is greatly simplified by a trilogy of Supreme Court decisions each addressing blanket bans on religious messages and each concluding that such bans constitute impermissible viewpoint discrimination.

First, in *Lamb's Chapel*, the Supreme Court confronted a New York law that permitted private citizens to use public school premises for "social, civic, and recreational meetings" but, as construed by state courts, prohibited such use for "religious purposes." *Lamb's Chapel*, 508 U.S. at 386-87. Consistent with that law as interpreted, the school district had refused to permit an evangelical church to use school facilities to show a film series on family and parenting, a refusal upheld by both the district and appellate courts. *Id.* at 388-90. The Supreme Court reversed. Treating the school premises as a nonpublic forum, the Court noted that "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 392-93 (alteration in original). However, the Court concluded that the ban was not viewpoint neutral because it impermissibly prohibited comment on otherwise permissible subject matters – "child rearing and family values" – on the ground that the film sought to discuss those subject

matters from a "religious perspective." *Id.* at 393-94. "[D]enial on that basis," the Court held, "was plainly invalid." *Id.* at 394.

Next, in *Rosenberger*, the Court considered a university program that dispensed funds to a variety of student groups, including "student news, information, opinion, entertainment, or academic communications media groups," 515 U.S. at 824 (internal quotation marks omitted), but excluded from eligibility any student group engaged in "religious activities," defined as activities that "primarily promote[] or manifest[] a particular belie[f] in or about a deity or an ultimate reality," *id.* at 825 (internal quotation marks omitted) (third alteration in original). Applying that rule, the university had denied funding to a student group that published a magazine focused on the "Christian Perspective at the University." *Id.* at 825-26. The Court found the denial unconstitutional. Focusing again on whether the restriction constituted a legitimate "content" restriction or unconstitutional "viewpoint discrimination," the Court found the rule to fall into the latter category. As the Court explained,

> By the very terms of the [ ] prohibition, the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints. Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, *a standpoint from which a variety of subjects may be discussed and considered.* The prohibited perspective, not the general subject matter, resulted in the [denial of funds] . . . for the subjects discussed were otherwise within the approved category of publications.

*Id.* at 831 (emphasis added).

Finally, in *Good News Club*, the Supreme Court confronted a school district policy that allowed for private use of school facilities for "instruction in any branch of education, learning or the arts" and "social, civic and recreational meetings and entertainment events" but excluded use "by any individual or organization for religious purposes." *Id.* at 102-03 (internal quotations

omitted). Consistent with that policy, the school district had refused to allow a "private Christian organization" to hold "weekly afterschool meetings" which would include "a Bible lesson and memorizing scripture." *Id.* at 103 (internal quotations omitted). The Court again invalidated the ban, finding it "quite clear that Milford engaged in viewpoint discrimination when it excluded the Club from the afterschool forum" because "the Club seeks to address a subject otherwise permitted under the rule, the teaching of morals and character, from a religious standpoint." *Id.* at 109. The Court thus held that "speech discussing otherwise permissible subjects cannot be excluded . . . on the ground that the subject is discussed from a religious viewpoint." *Id*. at 111-12.

That holding, announced in *Lamb's Chapel* and *Rosenberger*, and unequivocally "reaffirm[ed]" in *Good News Club*, *id.* at 111-12, guides our inquiry here. We begin with the unchallenged proposition, amply supported by the record, that Vermont freely permits motorists to use vanity plates for expression on a wide variety of subjects, including one's personal philosophy, beliefs, and values, and similarly allows statements of self-identity, affiliation, and inspiration. Having opened the forum to these "permissible subjects," the question before us is whether Vermont's ban on "any refer[ence] to . . . a religion" or "deity" serves to "exclude" speakers who wish to comment upon those otherwise permissible subjects simply because they seek to do so "from a religious viewpoint." We answer in the affirmative.

Whatever its stated intent, Vermont's ban on religious messages in practice operates not to restrict speech to certain subjects but instead to distinguish between those who seek to express secular and religious views *on the same subjects*. Under the current law, a motorist's personal philosophy, beliefs, and values are all permissible and frequent topics of expression – Vermont has issued plates such as CARP DM, PEACE2U, LIVFREE, and BPOSTIV, among others – provided

the philosophies, beliefs, and values express a secular perspective. Those who wish to express a personal philosophy, belief, or value that reflects, even only subjectively, a religious view – e.g., PRAY, ONEGOD, SEEKGOD – have been prohibited from doing so. Similarly, Vermont freely permits statements of identity and affiliation – e.g., BUTCHER, REBEL, ARMYMOM, GOYANKS; statements of love and admiration – e.g., THXDAD, ILUVLYN, MI3SONS, MISUDAD; and statements of inspiration – e.g., BEWILD, THNKPOS, HOPE4ME, DARE2BU – provided the statements express secular messages and perspectives. Those who would express themselves on matters of self-identity or make statements of love, respect, or inspiration from a religious viewpoint, however, through plates such as REV 3 20, THE REV, UM REV, and PSALM48, are excluded from the forum. It is, in other words, the "[t]he prohibited perspective, not the general subject matter" that leads to the exclusion. *Rosenberger*, 515 U.S. at 831.

Appellant's proposed plate – JN36TN – references the often-quoted Biblical verse, John 3:16, which reads in full: "For God so loved the world that he gave his only begotten Son, that whosoever believeth in him should not perish, but have everlasting life." The district court made no factual findings as to Byrne's intentions in referencing this passage – i.e., whether Byrne intended the message as a statement of personal belief or philosophy or simply as a statement of self-identity as a Christian or affiliation with the Christian church – and we need not dwell on them here. The critical fact is that Vermont permits use of state vanity plates for comment on *all* of these subjects, so long as the comment is from a secular perspective. The state rejected Byrne's message only because it addressed these areas of otherwise permissible expression from a religious perspective. This the state cannot do. Having opened its forum to a wide variety of "permissible subjects," it cannot target for exclusion those who wish to comment on these same subjects on the grounds that

they wish to do so from a religious viewpoint. "[D]enial on that basis [is] plainly invalid." *Lamb's Chapel*, 508 U.S. at 394.

Vermont's attempts to defend its statute by distinguishing its ban from those invalidated in *Lamb's Chapel*, *Rosenberger*, and *Good News Club* are unconvincing. Principally, the state argues that each of those cases involved "settings in which extensive discussion, debate, and consideration of opinions was possible" – i.e., settings unlike vanity plates which, according to the state, "are not a forum that allows for consideration, debate or an exchange of ideas on any subject." Respondents' Br. at 26. As a preliminary matter, the state cites no authority for the proposition that the First Amendment protects only forums in which "extensive discussion, debate, and consideration of opinions [i]s possible," nor are we aware of any. *Cf. Cohen v. California*, 403 U.S. 15, 19 (1971) (three-word inscription on back of jacket constitutes a protected "exercise of the 'freedom of speech'"); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969) (armband containing no text considered "expressi[ve]" and protected by the First Amendment). Moreover, irrespective of their size, license plates and their content have long been recognized as giving rise to First Amendment concerns, *see Wooley v. Maynard*, 430 U.S. 705, 717 (1977), as have vanity license plates in particular, *see, Perry*, 280 F.3d at 168-69; *see also Roach v. Stouffer*, 560 F.3d 860, 868 (8th Cir. 2009) ("[W]e conclude that the messages communicated on specialty plates are private speech . . . ."); *Choose Life Ill.*, 547 F.3d at 864 (finding that "private-speech rights are implicated" in restrictions on vanity license plates); *Ariz. Life Coal., Inc. v. Stanton*, 515 F.3d 956, 960 (9th Cir. 2008) ("Messages conveyed through special . . . plates . . . represent primarily private speech."); *Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles,* 288 F.3d 610, 621 (4th Cir. 2002) (concluding that "special plates constitute private speech"). Vermont provides no

credible reason for us to revisit – let alone reject – this authority.[9]

Alternatively, Vermont contends that because the law bans "all speech on" religion "whether positive, negative, or neutral" it is, "by definition viewpoint-neutral." Respondents' Br. 24-25. In the context of restrictions on all religious speech, this argument has been expressly considered – and rejected – by the Supreme Court. In *Rosenberger*, the dissenters argued that the ban on funding for student journalistic efforts promoting or manifesting a belief *about* a deity involved "no viewpoint discrimination . . . because the [law] discriminate[d] against an entire class of viewpoints" – including both religious and non-religious views. *Rosenberger*, 515 U.S. at 831. The Court rejected this reasoning, concluding that such an argument:

> reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. Our understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas. If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint. The dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways.

*Id.* at 831-32.

More generally, *Lamb's Chapel*, *Rosenberger*, and *Good News Club*, read together, sharply draw into question whether a blanket ban such as Vermont's on all religious messages in a forum that has otherwise been broadly opened to expression on a wide variety of subjects can neatly be

_____

[9] The Sixth Circuit alone has held in the distinguishable context of license plates bearing a "government-crafted message" that such plates constitute government rather than private speech. *See Am. Civil Liberties Union of Tenn. v. Bredesen*, 441 F.3d 370, 376 (6th Cir. 2006) ("[H]ere Tennessee sets the overall message to be communicated and approves every word that is disseminated on the . . . plate. It is Tennessee's own message." (internal quotations omitted)). The *Bredesen* decision neither addresses nor provides support for the contention that the permissibility of a restriction turns in any way on "the amount of expression obtainable" in the given forum. Respondents' Br. at 25.

classified as purely a "subject matter" restriction for purposes of First Amendment analysis. As the Court explained in *Rosenberger*, religion is not just a "vast area" but "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id.* at 831. Similarly, in *Good News Club*, 533 U.S. at 111, the Court rejected the argument that speech labeled "quintessentially religious . . . cannot also be characterized properly as [speech] . . . from a particular viewpoint." As the Court explained, "for purposes of the Free Speech Clause," there is "no logical difference in kind between" one community group's "invocation of [religion]" and another's "invocation of teamwork, loyalty, or patriotism" as a "*foundation for*" discussion of many subjects. *Id.* (emphasis added).

We emphasize that our conclusion here is limited to the context of a ban on religious messages, an area in which the Supreme Court's guidance has been both extensive and clear. We neither question the state's ability to limit expression in a nonpublic forum to certain subject matters, nor disturb the prior holding of this Court that Vermont's related ban on "scatalogical subjects" effects such a permissible viewpoint neutral and reasonable restriction. *See Perry*, 280 F.3d at 170. Moreover, we need not and do not address bans on religious speech in forums limited to discussion of certain, designated topics, *cf. DiLoreto v. Downey Unified Sch. Dist.*, 196 F.3d 958, 967-70 (9th Cir. 1999) (school district need not permit displaying of the Ten Commandments in nonpublic forum opened exclusively to commercial messages and closed to any "expressions of personal beliefs" because the Ten Commandments display "was not a statement addressing otherwise-permissible subjects from a religious perspective"), nor do we pass on whether bans on "[p]ure religious worship" may properly be characterized and upheld as subject-matter restrictions, *see Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 915 (9th Cir. 2007). *But see Good News*

*Club*, 533 U.S. at 126 (Scalia J., concurring) ("[W]e have . . . rejected the attempt to distinguish worship from other religious speech, saying that the distinction has no intelligible content, and further, no *relevance* to the constitutional issue." (internal quotations and brackets omitted) (emphasis in original)).

We simply find, consistent with *Lamb's Chapel*, *Rosenberger*, and *Good News Club*, that Vermont's ban on all religious messages in a forum it has otherwise broadly opened to comment on a wide variety of subjects, including personal philosophy, affiliation, and belief, serves not to restrict content but instead to discriminate against "a specific premise, [] perspective, [and] standpoint," *Rosenberger*, 515 U.S. at 831, and, as such, is impermissible.

### III

Having determined that Vermont's prohibition on references to any religion or deity in its vanity license plate program constitutes facially impermissible viewpoint discrimination, we also conclude that even if this were not the case, Vermont's prohibition is not reasonable as applied to Byrne.[10]

Reasonableness analysis turns on the "purpose of the forum and all the surrounding circumstances," *Cornelius*, 473 U.S. at 809; *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 147 (2d Cir. 2004), and to survive First Amendment scrutiny the restriction "need not be the most reasonable or the only reasonable limitation" imaginable, *Cornelius*, 473 U.S. at 808. However, at a bare minimum, the law must be "consistent with" a "legitimate [Government] interest." *Perry Educ. Ass'n*, 460 U.S. at 50.

Here, Vermont advances two such interests to justify its ban on references to any religion

---

[10] Given our disposition of Byrne's First Amendment claim, we need not and do not reach his Equal Protection argument.

or deity on a vanity license plate: first, an interest in "avoiding disruption and distraction of drivers through controversial plates" and, second, an interest in "avoiding the perception that the government favors certain ideas." Respondents' Br. at 30. Assuming both constitute legitimate government interests, we are unable to conclude that, in this case, Vermont has applied its statute in a manner that is consistent with either of them.

As discussed above, the Commissioner interprets the state law as requiring a ban on "religious meaning" and, therefore, the state DMV evaluates both a proposed license plate's "objective" meaning and a motorist's supplied meaning. Where the objective and supplied meanings align, the state's decision is clear, and the combination is approved or denied consistent with the statute. Where these meanings diverge, however, the state's application of its ban becomes troubling. The record indicates that under such circumstances the state generally adopts the motorist's supplied meaning rather than the plate's objective meaning and, as a result, will (1) approve plates that, to the general public, appear to contain overt religious references simply because the motorist supplied a personal, secular meaning, and (2) deny applications for combinations that are objectively meaningless to third-party observers on the grounds that a registrant ascribes a personal religious meaning to the proposed plate.

Vermont is unable to explain how either outcome is consistent with or in furtherance of the two government interests it proffers, both of which turn not on a subjective intent in selecting a combination but instead on the objective meaning a third-party might ascribe to that combination. Put differently, the state offers no rationale for how or why the combination GENESIS – which unquestionably represents, to many observers, a Biblical reference – somehow ceases to represent a risk of "disruption and distraction" to *other drivers* or a risk of *public* "perception that the government favors certain ideas" simply because the motorist *privately* intends the combination as

a reference to a rock group rather than the Old Testament. Similarly, Vermont offers no cogent explanation for why it needs to ban objectively meaningless combinations such as JMJ1 simply because the registrant – and likely the registrant alone – attaches religious meaning to that combination. The state certainly does not and could not seriously contend that such combinations pose any risk of "disruption or distraction" to other drivers or that they pose any threat of a perceived government favoritism of certain ideas.

The infirmities in Vermont's application of its own statute are amply demonstrated by the case at bar. Byrne applied for the plate JN36TN, which the state refused to issue because Byrne's supplied meaning indicated his intent to refer to the Biblical passage John 3:16. However, as Byrne argues, and the record supports, Vermont would have approved that *very same* combination had Byrne supplied a secular meaning for it – *e.g.*, "[M]y name is John, I am 36, [and] I was born in Tennessee." Of course, no one other than Byrne himself and the DMV clerk processing his application would know the difference – to all outside observers, the issued plate would appear the same irrespective of Byrne's supplied meaning – and yet the state would have us approve as "reasonable" its attempt to distinguish between the two applications for the same plate. This we decline to do. The state offers no legitimate government interest furthered in drawing such a distinction, nor can we discern any.

We stress that we express no opinion as to whether the statute, *as written*, furthers a legitimate interest in avoiding state association with controversial speech. *Cf. Cornelius*, 473 U.S. at 809 ("[A]voiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum."); *Make the Rd. by Walking*, 378 F.3d at 148 ("[W]here allowing private expression in a nonpublic forum may imply government endorsement of the expression, limiting or excluding speakers may be reasonable."). Our focus, in this secion, is solely on operation of

Vermont's ban as applied by the Commissioner, and specifically on the state's practice of considering a registrant's supplied or subjective meaning in enforcing the ban on references to religion or to a deity. With our inquiry limited in this way, we find that, as applied, the statute not infrequently results both in the issuance of plates that contravene the state's asserted interests and the denial of plates (such as Byrne's) where denial neither furthers nor is consistent with any legitimate government interest that Vermont asserts. We therefore conclude that Vermont's ban may, and in this case does, operate as an unreasonable and thus impermissible restriction on expression.

## CONCLUSION

Accordingly, we reverse the judgment of the district court and remand for further proceedings not inconsistent with this Opinion.