11-5199
Rex v. Martinez

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

August Term, 2012

(Argued: December 11, 2012          Decided: May 22, 2015)

Docket No. 11-5199-cv


_____


CHILDREN FIRST FOUNDATION, INC.,

*Plaintiff-Appellee,*

v.

BARBARA J. FIALA, in her official capacity as Commissioner
of the New York State Department of Motor Vehicles,

*Defendant-Appellant.*[*]


_____


Before: POOLER, HALL, and LIVINGSTON, *Circuit Judges*.

---

[*] The Clerk of the Court is directed to amend the caption as set out above.

Appeal from United States District Court for the Northern District of New York (Neal P. McCurn, *J.*) from its grant of a motion for summary judgment in favor of Children First Foundation, Inc. ("CFF"). The Commissioner of the New York Department of Motor Vehicles ("DMV") argues the district court erred in concluding that the DMV violated CFF's First Amendment rights when it denied CFF's application for a "Choose Life" custom license plate. We conclude that the DMV's custom plate program, as applied in this case, was reasonable and viewpoint neutral, and that the program did not vest the DMV commissioner with unbridled discretion in approving custom plate designs. As we find no First Amendment violation, the decision of the district court is reversed, and the case remanded for the purpose of entering judgment in favor of the defendant-appellant.

Reversed and remanded.

Judge Livingston dissents in a separate opinion.

_____

JEREMY D. TEDESCO, (Jeffrey A. Shafer, David A. Cortman, James P. Trainor, Kevin Theriot, *on the brief*), Alliance Defense Fund, Scottsdale, AZ, *for Appellee.*

ZAINAB A. CHAUDRY, (Andrea Oser, *on the brief*) and Eric T. Schneiderman, Attorney General of the State of New York *for* Barbara D. Underwood, Solicitor General, Albany, NY, *for Defendant-Appellant.*

POOLER, *Circuit Judge*:

A program offered by New York's Department of Motor Vehicles (the

"DMV" or "Department") permitted not-for-profit organizations to sponsor

"custom" license plates bearing a picture or logo representing their group.

Children First Foundation, Inc. ("CFF"), a nonprofit organization dedicated to promoting adoption, applied for a custom plate that included the message "Choose Life." The DMV rejected CFF's application, citing a Department policy against placing controversial, politically sensitive messages on license plates, which stemmed from highway safety concerns. CFF sued the DMV, and the United States District Court for the Northern District of New York (Neal P. McCurn, *J.*) granted CFF's motion for summary judgment, concluding that the DMV violated CFF's First Amendment rights and, in the alternative, that the entire program was unconstitutional on its face because it afforded the DMV Commissioner unbridled discretion over which custom plates to approve. We reach the opposite conclusion on both issues.

We conclude that the content of New York's custom license plates constitutes private speech and that the plates themselves are a nonpublic forum. CFF's facial challenge fails because New York's custom plate program did not impermissibly vest the DMV Commissioner with unbridled discretion in approving custom plate designs. Furthermore, that program, as applied in this case, was reasonable and viewpoint neutral, which is all that the First

3

Amendment requires of restrictions on expression in a nonpublic forum. As we find no First Amendment violation, the decision of the district court is reversed, and the case is remanded for the purpose of entering judgment in favor of the defendant-appellant.

Judge Livingston dissents in a separate opinion.

## BACKGROUND

### I.     Factual Background

From 1992 to 2004, the New York Department of Motor Vehicles ("DMV" or "the Department") administered a "Take Your Pride for a Ride" program as a means to raise revenue. The program permitted nonprofit organizations to apply for custom license plates supporting their causes. These plates customarily depict the nonprofit's logo and a mission-oriented tagline, under a "New York" banner. Once approved, the custom plates were made available to motorists as an alternative to the State's standard license plate design. Motorists paid a fee for custom plates, and the State and the organizational sponsor shared the proceeds.

The DMV approved custom plates submitted by a wide range of organizations. There are plates bearing the logos of sports teams, such as a World Series Champions plate celebrating the New York Yankees.   Other plates

advocate particular causes, such as a "Donate Life" plate proposed by an organization that promotes organ and tissue donation. Groups such as the Autism Society of America, the National Multiple Sclerosis Society, and the Animal Population Control Fund sponsored plates urging support for their causes. Relevant to this appeal, the DMV also approved a "Union Yes" plate in support of organized labor, and a "CopShot" plate, which raised funds to investigate acts of gun violence against police officers. The Department also permitted motorists to design and apply for vanity license plates bearing a unique combination of letters and numbers. Both custom and vanity plates are governed by the same regulations and DMV policies and procedures.

Plaintiff-Appellee Children First Foundation ("CFF") is a New York nonprofit corporation that promotes adoption as an alternative to abortion. In December 2001, CFF applied for a custom plate bearing its logo—a simulated crayon drawing of two children's smiling faces in front of a yellow sun—and a tagline that reads "Choose Life."

The DMV Commissioner at the time, Richard Martinez, denied the application in a letter dated February 25, 2002. In the letter, Martinez noted that one of his predecessors, Richard Jackson, had denied a similar application from a

different organization in 1998, and that, after reviewing Jackson's analysis of the issue, the DMV decided to again reject the "Choose Life" specialty plate request. The letter did not enclose the 1998 ruling nor explain the basis for the prior denial. Jackson's 1998 denial letter, which is part of the record on appeal, explained that it was the State's "policy not to promote or display politically sensitive messages" on its license plates, and that the Department's "concern is that a plate advocating politically sensitive and emotionally charged issues" may lead to incidents of road rage. App'x at 406.

CFF's counsel wrote a letter to the Department dated March 22, 2002, requesting a detailed explanation of the Department's decision. CFF's counsel sent a second letter, dated May 8, 2002, claiming that the DMV's denial constituted viewpoint discrimination in violation of the First Amendment and was a prior restraint on CFF's speech.

By letter dated June 10, 2002, the Department's Deputy Commissioner and Counsel Jill Dunn responded to CFF's letters. Dunn cited 15 N.Y.C.R.R. § 16.5(e), which states that "no plate shall be issued under this part which is, in the discretion of the commissioner, obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive." J.A. 440. Dunn explained,

6

"despite [CFF's] laudable goals and purposes, the message chosen to convey them, as indicated in the application, is subject to varying interpretations at best, and may even be misleading." App'x at 441. Dunn also stated that the Department believed "the phrase 'Choose Life' is more commonly associated with the abortion rights debate than it is with the promotion and funding of adoption," and thus the issuance of such a plate "would readily be perceived as governmental support for one side of a controversy that has existed in this country for several decades." App'x at 441.

Dunn raised a public safety concern, citing "the violence which has erupted outside medical facilities in New York and elsewhere," and concluding, "a significant segment of the population [would find] such plates to be patently offensive." App'x at 441. Dunn also stated that the Department's decision was "intended to preserve viewpoint neutrality by insuring [*sic*] that plates issued by the State do not present or support either side of this issue, or any other political, religious, or social issue that has proven to be so contentious and divisive." App'x at 441 (emphasis in the original). Dunn noted that while the Department "cannot control the placement of bumper stickers," it "will not place an instrumentality on public roadways which may engender violent discourse among drivers," and

7

that such actions would be counter to the DMV's "very mission [] to promote traffic safety for the protection of the general public." App'x at 441. In closing, Dunn explained that the Department would give "all due consideration" to "an application to display a message that is both directly related to [CFF's] own mission and unrelated to the controversial issues" cited therein. App'x at 441.

In October 2003, CFF submitted a redesigned plate for the Department's consideration. CFF shrank the words "Choose Life" and shifted them from the tagline position at the bottom of the plate to a less prominent position underneath the logo. The new tagline read "FUND-ADOPTION.ORG." App'x at 314. CFF stated that the new tagline better reflected its purpose, but that a "Support Adoption" or "Choose Adoption" plate would not sell as well as a plate containing the words "Choose Life," which it maintained must remain on the plate for marketing purposes. App'x at 308. CFF explained that "'Choose Life' appeals to a much wider audience that encompasses not only pro-adoption, but also [anti-abortion] and anti-death penalty supporters as well." App'x at 329.

Commissioner Martinez rejected the revised application in a letter dated March 31, 2004. He explained that CFF's revisions failed to address the fundamental concerns that led the DMV to deny CFF's prior application.

Martinez conveyed his belief that in its second application, CFF had "acknowledge[d] that the phrase 'Choose Life' rather than 'Choose Adoption' or 'Support Adoption' is more appealing to your organization *specifically* because it appeals to pro-life and anti-death penalty supporters," and further stated:

> I have little choice but to interpret this as an acknowledgment that the proposed plate design is, in fact, intended to draw attention to the very political, social and religious issues that were addressed in Deputy Commissioner Dunn's June 2002 letter. Based on the acts of violence and death that have surrounded the abortion debate, I simply will not voluntarily put an instrumentality on our public roadways that will incite the type of anger and outrage as we have seen outside abortion clinics in New York State and elsewhere.

App'x at 438. Martinez also suggested that CFF petition the Legislature to approve its custom plate.

Instead of petitioning the Legislature, however, CFF submitted a third application in July 2004 after unsuccessfully urging then-Governor Pataki to direct the Department to issue the Choose Life plate. The third design included "Choose Life" and the logo, but proposed a tagline of "SafeHavens-Adoption.org" or "NYChoose-Life.org." App'x at 461, 463. In August 2004, Commissioner Martinez suspended the custom plate program in

9

order to review and update "the criteria and standards for considering applications" for new custom plates "through the formal regulatory process." App'x at 478. Dunn notified CFF of the moratorium and stated in a letter that despite CFF's third application, the original decision remained unchanged, and that "there is no application currently pending which is ripe for consideration." App'x at 478. The moratorium on new custom plate applications still stands, but the DMV continues to issue custom plates that were approved prior to the moratorium.

## II.     Procedural Background

In August 2004, CFF commenced the present action against the Department,[1] pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief as well as monetary damages. CFF alleged that the DMV's denial of its custom plate applications violated its free speech rights under the First Amendment. CFF also alleged due process and equal protection violations under the Fourteenth Amendment.

---

[1] Although the current DMV Commissioner, Barbara J. Fiala, is the named appellant, we refer to the DMV as the Defendant-Appellant, both for ease of reference and because Fiala is only named in her official capacity.

The parties filed cross motions for summary judgment. In its decision on those motions, the district court first concluded: (1) that the speech at issue is private, as opposed to government, speech; and (2) that the custom plates constituted a nonpublic forum. The court granted CFF's motion on three separate grounds: (1) the Commissioner's alleged "exclusion of the entire subject of abortion from the forum is not permissible content-based discrimination but is discrimination based on viewpoint;" (2) the "denial of CFF's plate application was unreasonable" based on "the purpose of New York's custom plate forum," which is to disseminate a variety of private affiliations; and (3) the DMV's regulations and practices granted the Commissioner "unbridled discretion" to approve or deny applications for custom plates. *Children First Found., Inc. v. Martinez*, 829 F. Supp. 2d 47 (N.D.N.Y. 2011). Because CFF prevailed on its First Amendment claims, the district court did not address its due process and equal protection claims. The court ordered the Commissioner to approve CFF's custom plate application, but stayed execution of the judgment until resolution of the anticipated appeal.

The Department appealed, challenging all of the district court's adverse conclusions pertaining to CFF's First Amendment claims.

**DISCUSSION**

"We review *de novo* a district court's grant of summary judgment." *Byrne v. Rutledge*, 623 F.3d 46, 52 (2d Cir. 2010). We "will affirm only if, construing the evidence in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 132 (2d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). When faced with cross motions for summary judgment we "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne*, 623 F.3d at 53 (internal quotation marks omitted).

The primary issues before us are: (1) whether the DMV's custom license plate program is facially invalid as a prior restraint on speech because it does not sufficiently constrain the Commissioner's ability to exercise unbridled discretion; and (2) if the program is facially valid, whether the DMV violated CFF's First Amendment rights when it rejected CFF's custom plate applications. In order to reach these issues, first we must determine whether the messages on the custom

plates constitute government or private speech. We must then determine what type of forum the custom plate program created.

**I. First Amendment Claims**

**A. Government Speech or Private Speech**

"The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). The threshold question presented for our review is thus "whether the messages on specialty license plates are government speech, private speech, or a combination of the two." *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 860 (7th Cir. 2008). If we conclude that those messages are anything but private speech, our First Amendment analysis ends, "because there has been no First Amendment violation—in fact, the First Amendment would not even apply." *Texas Div., Sons of Confederate Veterans, Inc. v. Vandergriff*, 759 F.3d 388, 393 (5th Cir. 2014) *cert. granted sub nom. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 752 (2014).

The Supreme Court has not yet articulated a test to distinguish government speech from private speech, although the issue is currently pending before the Court. *See id.* Nor has our Court constructed such a test, but we do have the

13

benefit of persuasive authority from our sister circuits to guide our inquiry. We find the Fifth Circuit's analysis in *Vandergriff*—a case that also pertains to specialty license plates—to be particularly helpful, and its test formulation convincing. The *Vandergriff* court looked to the two Supreme Court cases that are most on point, *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), and *Summum*, 555 U.S. at 467–68, and concluded: "Considering the emphasis on context and the public's perception of the speaker's identity in *Summum*, we think the proper inquiry here is 'whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige.'" *Vandergriff*, 759 F.3d at 394 (quoting *Summum*, 555 U.S. at 487). This is apt distillation of the Supreme Court's jurisprudence on this question.

Applying this test to the specialty license plates at issue here, we have little difficulty concluding that such an observer would know that motorists affirmatively request specialty plates and choose to display those plates on their vehicles, which constitute private property. *See Wooley v. Maynard*, 430 U.S. 705, 713 (1977) (characterizing cars as "private property"). The connection between the message displayed by the specialty plate and the driver who selects and displays

14

it is far stronger than the connection between the message and the Department's stamp of approval. We thus join the Fourth, Fifth, Seventh, Eighth, and Ninth Circuits, which have held that messages on specialty license plates are private speech. *See Vandergriff*, 759 F.3d at 396 (5th Cir. 2014) (holding "that specialty license plates are private speech"); *Roach v. Stouffer*, 560 F.3d 860, 867 (8th Cir. 2009) (concluding that specialty plates are private speech); *Choose Life*, 547 F.3d at 863 (7th Cir. 2008) ("Messages on specialty license plates cannot be characterized as the government's speech."); *Ariz. Life Coal., Inc. v. Stanton*, 515 F.3d 956, 968 (9th Cir. 2008) ("Messages on specialty license plates in Arizona are private speech); *Sons of Confederate Veterans, Inc. v. Comm'n of Virginia Dep't of Motor Vehicles*, 288 F.3d 610, 621 (4th Cir. 2002) (messages on Virginia specialty license plates are private speech); *but see Am. Civil Liberties Union of Tenn. v. Bredesen*, 441 F.3d 370, 376 (6th Cir. 2006) ("Choose Life" message on Tennessee specialty license plate is government speech).

Our conclusion is consistent with our opinions in *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001) and *Byrne v. Rutledge*, 623 F.3d 46 (2d Cir. 2010). In those cases, the court did not address whether the messages on vanity plates constituted government speech or private speech but instead proceeded directly

15

to the forum analysis. Since a forum analysis is only undertaken once speech is deemed to be private, however, *see Summum*, 555 U.S. at 469 (stating that government speech is not restricted by the Free Speech Clause), these cases are reasonably to be interpreted as implying that the messages on specialty plates constitute private speech.

We conclude that custom license plates display private speech, and that the messages they convey are thus subject to First Amendment protection. Accordingly, we proceed to determine the type of forum the Department established through its custom license plate program.

**B. Forum Analysis**

Even though the writing on license plates constitutes private speech, the plates themselves remain government property, and "[i]t is well established that the government need not permit all forms of speech on property that it owns and controls." *Perry*, 280 F.3d at 166. Because "'the government is permitted to exercise control over the public's use of government-owned property for expressive purposes, and the degree of control permitted depends upon the nature of the property and the speech restrictions imposed thereon,'" we must first consider the nature of the government property, or forum, at issue. *Zalaski v.*

16

*City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010) (quoting *Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 544 (2d Cir. 2002)).

In reviewing an alleged unconstitutional restriction on speech, we have recognized that "[t]he level of scrutiny applied . . . depends upon the nature of the forum in which the speech occurs." *R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 539 (2d Cir. 2011). We have traditionally recognized three categories of government property: (1) the traditional public forum; (2) the designated public forum; and (3) the nonpublic forum. *Byrne*, 623 F.3d at 53 (citing *Perez v. Hoblock*, 368 F.3d 166, 172-73 (2d Cir. 2004)). More recently, we recognized a fourth category: the limited public forum, which is "a subset of the designated public forum." *Hotel Employees*, 311 F.3d at 545.

A traditional public forum is government property that "by long tradition or by government fiat . . . ha[s] been devoted to assembly and debate," such as a public street or square. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Restrictions on speech in a public forum are subject to strict scrutiny, and thus will be upheld only when the restriction is both "necessary to serve a

compelling state interest," and "narrowly drawn to achieve that interest."

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).

A designated public forum is created when the government "intentionally open[s] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. "Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry Educ. Ass'n*, 460 U.S. at 46. Thus, restrictions on speech in designated public forums must also survive strict scrutiny. *Cornelius*, 473 U.S. at 800.

The government creates a limited public forum when it "opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *R.O. ex rel. Ochshorn*, 645 F.3d at 539 (internal quotation marks and emphasis omitted). In a limited public forum, "strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened." *Hotel Employees*, 311 F.3d at 545. Restrictions that fall outside of that category "need only be viewpoint neutral and reasonable." *Id.* at 546. Finally, a nonpublic forum is government "property that is not traditionally open to the public and that the government

has not opened for expressive activity by members of the public." *Byrne*, 623 F.3d at 53. A restriction on speech in a nonpublic forum must only be reasonable and viewpoint-neutral. Our forum determination thus hinges "on the government's intended purpose for the property." *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 129 (2d Cir. 1998).

The district court identified New York's custom plates as either a limited public forum or a nonpublic forum but did not decide between the two because, in either situation, the applicable test would require the program to be reasonable and viewpoint neutral. On appeal, the DMV argues that the custom license plates constitute a nonpublic forum. CFF counters that the plates constitute a designated public forum, or a limited public forum in which strict scrutiny should be applied in this instance. CFF argues in the alternative that the DMV's denial of its application was neither reasonable nor viewpoint neutral.

This court has twice found government-issued specialty license plates to be a nonpublic forum—albeit the plates in those instances were vanity license plates, as opposed to custom license plates. *See Byrne*, 623 F.3d at 53–54; *Perry*, 280 F.3d at 167. In *Perry*, the state of Vermont revoked an individual vanity plate that read "SHTHPNS," an abbreviation for "Shit Happens." *Perry*, 280 F.3d at

19

163, 167. The *Perry* court concluded that the Vermont's vanity plates created a nonpublic forum and provided several factors that informed our decision. For one, the regulations regarding vanity plates were so restrictive that the constrained speech was not indicative of a designated forum. *Id.* at 167–68. The court also considered that the stated purpose of issuing license plates was vehicle identification rather than public discourse. *Id.* at 167. The court further noted that the program was designed to raise revenue, so that the minimal allowance of speech did not demonstrate the government's intention to create a designated forum. *Id*. The fact that the general public did not have unrestricted access to the plates further evinced the lack of government intent to create a public forum. *Id.* at 168. Finally, the court considered the nature of license plates as being a restricted forum for open discourse. *Id.* at 168–69.

Similarly, in *Byrne*, the State of Vermont denied the plaintiff's request for a vanity plate that read "JN36TN" in reference to "the often-quoted Biblical verse, John 3:16," because of a state law banning "all vanity plate combinations that 'refer, in any language, to a . . . religion' or 'deity.'" *Byrne*, 623 F.3d at 49 (quoting Vt. Stat. Ann. Tit. 23, § 304(d)(1), (3)(A)). Applying the same line of reasoning as

*Perry*, this court again concluded that motor vehicle license plates constitute a nonpublic forum. *Id.* at 54.

By way of comparison, in *New York Magazine v. Metropolitan Transit Authority*, this court held that "the advertising space on the outside of MTA buses is a designated public forum, because the MTA accepts both political and commercial advertising." *N.Y. Magazine*, 136 F.3d at 130. The court determined that New York City's intent was to invite discourse in a designated forum, because the City allowed advertisements containing "political speech" and "clashes of opinion and controversy" on MTA buses. *Id*.

Turning to the forum in this case, we conclude that there is no material difference between Vermont's vanity plate program and New York's custom plate program—or between the nature of custom and vanity plates generally—that permits us to diverge from *Perry* and *Byrne*. The DMV has not given the general public open access to the custom plate program. *See Perry Educ. Ass'n*, 460 U.S. at 47 (stating that a designated public forum exists where government permits "indiscriminate use by the general public"). Quite the contrary: the DMV maintains discretion to limit speech on custom license plates through the application process. *Cf. Perry*, 280 F.3d at 168 (stating that "the

21

general public does not have unimpeded access to Vermont license plates" and that the requirement for obtaining permission was evidence that Vermont did not intend to create a public forum).

Furthermore, New York established this forum not to create discourse, but to raise revenue. Unlike the advertising scheme in *New York Magazine*, New York's custom license plate program does not invite "clashes of opinion and controversy." 136 F.3d at 130. Instead, the DMV did precisely the opposite by consistently excluding controversial political speech from the custom plate program. The DMV regulated speech on custom plates in order to advance the Department's overarching mission of public safety. These actions indicate that the forum was intended to allow for limited speech in order to raise money, not to invite debate.

Finally, as this court and others have held, the very nature of license plates precludes us from concluding that the program creates a public forum of any stripe. *See Perry*, 280 F.3d at 168 ("The very character of license plates [] suggests that they are not a designated public forum."). As the Seventh Circuit has noted, "[l]icense plates are not by nature compatible with anything more than an extremely limited amount of expressive activity." *Choose Life Ill.*, 547 F.3d at 865.

22

By their very nature, license plates are not designed for open discourse or the open exchange of ideas but rather to identify vehicles, facilitate traffic safety, and in the case of specialty plates, to raise revenue.

Against the backdrop of *Perry* and *Byrne*, we readily conclude that New York's custom license plate program created a nonpublic forum, and thus, that the Department's rejection of CFF's proposed plate must only be reasonable and viewpoint neutral.

We next turn to CFF's facial and as-applied First Amendment challenges. We begin with the facial challenge, because if New York's custom license plate regime is facially invalid, there will be no reason to reach the as-applied challenge, whereas the opposite is not true.[2]

---

2 The Supreme Court has held that when it comes to freedom of expression, a regulation "may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992). "This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Id.* As a result, "the Court has permitted a party to challenge an ordinance . . . in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker." *Id.* at 129-30. We believe that a facial challenge based on the unbridled discretion doctrine unquestionably falls into this category. Moreover, because the harm that the doctrine combats is the inability of as-applied challenges effectively to detect and remedy potential acts of unconstitutional viewpoint discrimination, *see infra* Section C, it makes little sense to tackle an as-applied challenge prior to testing for unbridled discretion. *See e.g., Matwyuk v. Johnson*, 22 F. Supp. 3d 812 (W.D. Mich. 2014) (resolving a facial challenge claiming unbridled

**C. Facial Challenge and Unbridled Discretion.**

CFF argues that the Department's custom plate program violates the First Amendment because it affords the Commissioner unbridled discretion with respect to which applications to approve and which to reject. Our dissenting colleague agrees, but we do not.

As the Supreme Court explained, "in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). Unbridled discretion is inconsistent with the First Amendment because "it allows officials to suppress viewpoints in surreptitious ways that are difficult to detect." *Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 103 (2d Cir. 2007). In order to survive a First Amendment challenge based on a claim of unbridled discretion, a regime that subjects speech to a prior restraint, such as New York's custom plate program, "must, as a prophylactic matter, contain 'narrow, objective, and definite standards to guide the licensing authority.'" *Id.* (quoting *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)).

---

discretion before resolving an as applied challenge).

Before proceeding further, we note that throughout the lifespan of this case, CFF's unbridled discretion argument has taken a back seat to its as-applied challenge. Perhaps as a result, neither the parties nor the district court have clearly isolated it as a separate, facial challenge to a prior restraint, nor analyzed it in that context. The distinction is significant, however, and we take this opportunity to frame the issue more clearly and completely.

The unbridled discretion doctrine is inextricably linked to its function as a facial challenge because the "risks to free expression" that it is designed to prevent "can be effectively alleviated only through a facial challenge." *Lakewood*, 486 U.S. at 757. The first of two such risks is the potential for self-censorship that arises where "the mere existence of the licensor's unfettered discretion [is] coupled with the power of prior restraint." *Id.* "Self-censorship is immune to an 'as applied' challenge, for it derives from the individual's own action, not an abuse of government power." *Id.* Thus, "only a facial challenge can effectively test" for the standards required to limit the administrator's discretion. *Id.* at 758.

The second risk that the doctrine combats is "the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action." *Id.* at 759; *see also*

*Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1320 (Fed. Cir. 2002) ("[T]he absence of express standards . . . makes it difficult to prove illicit discrimination in an as-applied challenge. Given the burden of challenging the licensor's actions case-by-case, these barriers to as-applied challenges may render the licensor's decisions unreviewable unless facial challenges are allowed."). We therefore clarify that, consistent with every prior application of the unbridled discretion doctrine of which we are aware, CFF's challenge to New York's custom license plate program is properly construed as a facial challenge to a prior restraint. *See, e.g.*, *Lakewood*, 486 U.S. 750; *Forsyth*, 505 U.S. 123; *Byrne*, 623 F.3d 46; *Roach*, 560 F.3d 860; *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299 (Fed. Cir. 2008); *Amidon*, 508 F.3d 94; *Griffin*, 288 F.3d 1309; *Perry*, 280 F.3d 159.

A plaintiff raising a facial challenge shoulders a "heavy burden." *Amidon*, 508 F.3d at 98 (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). "Facial invalidation is, manifestly, strong medicine, that [is to be employed] sparingly and only as a last resort." *Finley*, 524 U.S. at 580 (internal quotation omitted). To prevail, a plaintiff "'must demonstrate a substantial risk' that application of the challenged practice or provision will lead to a First Amendment violation." *Amidon*, 508 F.3d at 98 (quoting *Finley*, 524 U.S. at 580);

26

*see also Griffin*, 288 F.3d at 1321 ("[I]n order to consider his facial challenge, [plaintiff] must still show a realistic possibility that application of [the regulation that he challenges] will suppress a substantial amount of constitutionally protected speech.").

As a threshold issue, we must determine whether the unbridled discretion doctrine applies in the context of nonpublic forums. Although the Supreme Court offers no explicit guidance on this subject, it is plain that the answer is "yes." The dangers posed by unbridled discretion are as present in nonpublic forums as they are in the traditional public forums, where the doctrine has most commonly been deployed. *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 386–87 (4th Cir. 2006). Furthermore, we see no reason why a doctrine that is designed largely to target "undetectable viewpoint discrimination," *Amidon*, 508 F.3d at 103, should not apply in nonpublic forums, where restrictions must be viewpoint neutral. In *Perry*, our Court implicitly reached such a conclusion by applying the unbridled discretion doctrine to Vermont's vanity plate program, which it had previously deemed a nonpublic forum. 280 F.3d at 169–73.

We thus join our sister circuits that have, over time, been coalescing around the conclusion that the unbridled discretion doctrine applies in the context of nonpublic forums. *See Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012); *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1069 (4th Cir. 2006); *Griffin*, 288 F.3d at 1197–1200; *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002); *Sentinel Communications Co. v. Watts*, 936 F.2d 1189 (11th Cir. 1991).

To avoid an official exercising unbridled discretion in the context of a prior restraint there must be "adequate standards to guide the official's decision." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 176 (2d Cir. 2006) (quoting *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002)). We do not, however, require "perfect clarity and precise guidance" from such standards. *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *see also Field Day*, 463 F.3d at 179. Additionally, "when a state law has been authoritatively construed so as to render it constitutional, or a well-understood and uniformly applied practice has developed that has virtually the force of a judicial construction, the state law is read in light of those limits. That rule applies even if the face of the statute might not otherwise suggest the limits imposed." *Lakewood*, 486 U.S. at 770 n.11 (citing *Poulos v. New Hampshire*,

28

345 U.S. 395 (1953)). We "presume any narrowing construction or practice to which the law is fairly susceptible." *Id.* (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for in evaluating a facial challenge to a state law, a federal court must consider any limiting construction that a[n] enforcement agency has proffered." (internal quotation marks and alterations omitted)). Finally, when, as in this instance, a nonpublic forum is involved, "greater latitude ought to be accorded to government officials," as "[s]electivity and discretion are some of the defining characteristics of the nonpublic forum." *Griffin*, 288 F.3d at 1323. "[T]he fact that discretionary access is a defining characteristic of the nonpublic forum should suggest that more official discretion is permissible in a nonpublic forum than would be acceptable in a public forum." *Id.* at 1324. We now turn to the challenge before us.

New York's custom plate program was established under the authority vested in the DMV Commissioner by N.Y. Veh. & Traf. Law § 404, which empowers—but expressly does not require—the Commissioner to issue specialty plates in accordance with regulations the Commissioner promulgates. Pursuant

29

to § 404, the DMV promulgated 15 N.Y.C.R.R. § 16.5(e), which states that no plate shall be issued that "is, in the discretion of the commissioner, obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive." We agree with CFF and our dissenting colleague that these two provisions afford the commissioner broad discretion. Commissioner Martinez even admitted as much. The ability of these two provisions—standing alone—to provide an adequate safeguard against the Commissioner's exercise of unbridled authority is dubious. Our universe, however, is not so narrowly drawn. We must also look to any pertinent agency policies and practices, written or unwritten, as long as they are well-established and "uniformly enforced." *See Griffin*, 288 F.3d at 1326 (presuming any "narrowing construction or practice to which the [program] is fairly susceptible"); *Lakewood*, 486 U.S. at 770 n.11 (citing *Erznoznik*, 422 U.S. 205).

In a 1998 letter denying a different party's application for a "Choose Life" custom plate, the Commissioner at the time, Richard Jackson, provided the following explanation:

> It is the State of New York's policy not to promote or display politically sensitive messages on our license plates. You may have heard and read a great deal lately

30

about the subject of "road rage." Increasingly, even simple gestures and small discourtesies on highways have led to serious incidents between drivers and even fatal accidents and criminal charges.

Our concern is that a plate advocating politically sensitive and emotionally charged issues may lead to further incidence of aggressive driving or worse. Therefore, we have no plans to offer any plate which has the possibility of compromising the safety of anyone driving on New York highways.

App'x at 406. Jackson testified in this case that he indeed adhered to the policy

that anything advocating either side of a political position would be rejected.

Throughout the period of correspondence between DMV officials and CFF's

attorney, which began four years after the DMV denied the identical but

unrelated application for a "Choose Life" plate, the DMV maintained its position

that it would not issue the plate due to a concern over violent reactions, and that

it would not issue a plate supporting either side of this issue "or any other

political, religious or social issue that has proven to be so contentious and

divisive." App'x at 409; *see also* App'x at 438–39. Commissioner Martinez and

other DMV officials involved in the custom plate program also testified that

pursuant to the Department's policy, custom plates espousing a particular

31

political position were not approved due to concerns over road rage. We conclude, therefore, that this policy was sufficiently "well established."

Our inquiry does not end there, however, because in order to pass constitutional muster the Department's policy must also be "uniformly applied." The Department evaluated numerous applications, for both custom and vanity plates, and had previously denied plate requests on the basis of its policy. For example, the DMV denied an application for a "Restore the Wolf" custom license plate at a time when the topic was the subject of heated debate in the Adirondacks. Speaking to the media, a DMV spokesman stated that this was "the first time a group has requested a specialty plate focusing on a political issue." App'x at 1664. In that instance, "the State found the proposed plate could be interpreted as a governmental endorsement for one side of a highly-charged controversy surrounding the reintroduction of this animal to upstate New York," and based its denial on that real concern. App'x at 1664–65. Similarly, the DMV denied a request for a vanity plate reading "RU486," a reference to the "morning-after pill," in order to avoid the appearance of government endorsement of a pro-choice stance in the abortion debate. App'x at 1458–59. The

Department also applied this policy when it denied the 1998 application for the "Choose Life" custom plate.

CFF focuses not on the instances when plate proposals were rejected but rather on instances when the DMV approved certain plates, which CFF claims espouse messages on similarly controversial political topics. Specifically, CFF points to plates that read "Cop Shot," and "Union Yes."[12] But the issue of bringing to justice individuals who have attacked police officers cannot reasonably compare—either by its very nature or by the level of contentiousness that surrounds it—to the issue of abortion. With respect to the decision to issue a "Union Yes" plate, while the myriad issues pertaining to organized labor in the United States are social and political in nature, there is no basis to conclude that the Department failed to apply the policy against creating plates that touch upon contentious political issues as opposed to having applied the policy and merely reaching a different result than it did with the "Choose Life" plate. It is not our

---

[12] CFF also argues that there is no clear distinction between the "Choose Life" plate and a "War on Terror Veteran" plate to justify the DMV's rejection of the former and acceptance of the latter. Such a comparison fails, however, since the "War on Terror Veteran" plate was created through a legislative action, and not through the DMV's custom plate program. *See* N.Y. Veh. & Traf. Law § 404-w.

place to evaluate and weigh the various hot button issues of our time against one another, assigning to each a specific place in the landscape of public debate in this country. The DMV's policy does require interpretation and line drawing as to which subjects to exclude entirely, but that does not undermine the policy's potency as a safeguard against the Commissioner's exercise of unbridled discretion. Put another way, some discretion—particularly in a nonpublic forum, where "[s]electivity and discretion are some of the defining characteristics" of the forum, *Griffin*, 288 F.3d at 1323—does not constitute unbridled discretion. After all, "perfect clarity and precise guidance" are not required. *Amidon*, 508 F.3d at 103 (citation omitted); *see also Ward*, 491 U.S. at 794 ("While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."); *Thomas*, 534 U.S. at 325 (concluding that the potential abuse of a waiver program "must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements"). The commissioner's approval of the "Union Yes" plate does not indicate inconsistent application of the DMV's policy.

Finally, we are not troubled by the scant number of times the DMV rejected a custom plate application based on its policy of avoiding contentious political issues altogether, nor do we believe that a larger sample size is required for us to determine that the policy was both well-established and consistently applied. Indeed, the dearth of rejections is far more consistent with a regime that, on the whole, promotes rather than constricts free speech, as opposed to a regime that poses the type of "substantial risk" of impermissibly curtailing free speech for which facial invalidation is reserved. *See Amidon*, 508 F.3d at 98.

We conclude that the DMV's policy of excluding completely controversial political and social issues—regardless of the particular viewpoint espoused—from the nonpublic forum of custom license plates, based on concerns pertaining to potential violence and the perception of state endorsement of the message, is sufficiently well-established and has been uniformly enforced so as to render the Commissioner's discretion adequately bridled.

We are convinced not only by the policy itself but also by the procedures by which the DMV effectuates that policy. In determining what is "politically sensitive" and "emotionally charged," the Department's established practice calls

35

for the Commissioner to confer with the "Executive Deputy Commissioner, the Deputy Commissioner and members of [the] legal staff." App'x at 1457–59. Although this is a facial challenge and is thus "not dependent on the facts surrounding any particular permit decision," *Forsyth*, 505 U.S. at 133 n.10, we find the procedures used by the DMV after it had engaged in internal deliberations to be particularly revealing. Specifically, the DMV explained its decision in detail, and it suggested changes that CFF could make to its proposed plate design which would allow the plate to be approved. In *Forsyth*, the Supreme Court concluded that a county administrator had unbridled discretion based in part on the facts that the administrator was not required to "provide any explanation for his decision" and his decisions were "unreviewable." 505 U.S. at 133. The DMV's process is not a black box. We construe this level of transparency and communication with the applicant as a narrowing construction and part of the overall custom plate program.

To grasp the significance of the DMV's "rejection process," we return to the rationales underlying the unbridled discretion doctrine and the reasons why the Supreme Court determined that the First Amendment requires recognition of this particular brand of facial challenge. The "identifiable risks to free

36

expression" posed by unbridled discretion are two-fold: (1) "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused," and, as relevant to the DMV's rejection process, (2) without sufficient "guideposts that check the licensor . . . *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Lakewood*, 486 U.S. at 757–58. By expressly identifying the element of the proposed plate upon which the rejection is based—and suggesting concrete changes that CFF may make in order for the plate to be approved—the Department has isolated the variable upon which its decision was based. Once again, *Griffin* is on point and persuasive. There the court concluded that any potential constitutional violation posed by the contested regulation was more appropriately addressed through as-applied challenges in part "because the *Lakewood* rationales for facial invalidation [were] weak in the context of this challenge." 288 F.3d at 1327–28. Moreover, the threat of self-censorship here is mitigated by a rejection process that permits reapplication, not to mention the

fact that individuals are still permitted to express their beliefs in other, very similar means to which the State's program does not apply (e.g., bumper stickers). *See Perry*, 280 F.3d at 169 ("Vermont's policy does not prevent Perry from communicating any particular message on her automobile. For instance, Perry may display a bumper sticker bearing the letters SHTHPNS if she so desires.").

CFF's reliance on *Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009) is misplaced. There, the Eighth Circuit found that a Missouri law vested unbridled discretion in state officials where the law authorizing the "Joint Committee" to approve plates only provided that "the committee shall approve [the plate] by unanimous vote," without any further guidelines. *Id.* at 869–70. The Eight Circuit cautioned that "'[a] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship.'" *Roach*, 560 F.3d at 869 (alteration omitted) (quoting *Lakewood*, 486 U.S. at 763). Because the regulation at issue in *Roach* provided "no standards or guidelines whatsoever to limit the unbridled discretion of the Joint Committee," and "[c]onsequently the Joint Committee can deny an application for a specialty plate based solely on the organization's viewpoint," *id.* at 869–70, the Eighth Circuit concluded that the

regulation ran afoul of the First Amendment. Here, by contrast, the regulation itself and the DMV's well-established and consistently applied policy and practice provide the guidelines that were lacking in *Roach.*

Relying on *Beal v. Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999), CFF argues that the existence of the statute is insufficient because the standards set forth are vague and thus do not adequately bridle the Commissioner's discretion. We disagree. Although the regulation prohibiting license plates that are "obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive" may require some parsing, these are words that judges, and members of the legal profession in general, interpret and apply frequently. In *Perry*, for example, this Court was able to determine that the word "shit" was "offensive." Perry, 280 F.3d at 169. Again, in a nonpublic forum analysis, the fact that the Commissioner may exercise some discretion is not fatal to the statutory scheme. Thus, while the constraints on the Commissioner may be modest, they are sufficient to bridle the Commissioner's discretion and thus to pass Constitutional muster.

Finally, any suggestion that the custom plate regime is impermissible because it is framed in terms of when the Commissioner *may not* exercise

39

discretion, as opposed to when the Commissioner *may* exercise that discretion, *see* **Dissent at 12-13,** is unavailing. In *Perry*, we upheld Vermont's custom plate regime, which included a regulation that limited discretion by prohibiting, not permitting, certain content. *Perry*, 280 F.3d at 172 n.9 (citing VT. CODE R. 14-050-025). We see no reason why an administrator's discretion must be bridled by mechanisms that provide a floor, rather than serve as a ceiling—particularly so in the context of nonpublic forums, where the government administrator may be afforded "greater latitude," *Griffin*, 288 F.3d at 1323. The closely related argument on the permissive nature of the relevant statutory and regulatory provision (*i.e.*, that the Commissioner "may" issue custom plates but is never required to do so) similarly unavailing. *See Thomas*, 534 U.S. at 325 (concluding that "[o]n balance . . . the permissive nature" of [a similar] ordinance framed similarly to the relevant provisions in this case "furthers, rather than constricts, free speech").

In sum, 15 N.Y.C.R.R. § 16.5(e), coupled with the Department's well-established and consistently applied policy and practice, leads us to conclude that objective criteria do indeed limit the exercise of the Commissioner's discretion. CFF, having availed itself of the opportunity to

40

challenge facially the custom plate program under the unbridled discretion doctrine, must "also bear the 'heavy burden' imposed on those seeking to invalidate a law on its face," *Griffin*, 288 F.3d at 1328. *See also Finley*, 524 U.S. at 580; *Amidon*, 508 F.3d at 98. We conclude that CFF has failed to "'demonstrate a substantial risk' that application of the challenged practice or provision will lead to a First Amendment violation," *Amidon*, 508 F.3d at 98 (quoting *Finley*, 524 U.S. at 580). We thus sustain the program on its face and turn to CFF's as-applied challenge.

## D. As-Applied Challenge

In a nonpublic forum, the government enjoys great "latitude in restricting speech," and "may limit access or content 'based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *Byrne*, 623 F.3d at 54 (quoting *Cornelius*, 473 U.S. at 806). Here, the district court held that the DMV's denial of the "Choose Life" custom plate was both "viewpoint discriminat[ion]" and "unreasonable." *Children First Found.*, 829 F. Supp. 2d at 59–63. We disagree with both conclusions.

## 1. Viewpoint Neutrality

Two principles guide our evaluation of viewpoint neutrality within the context of a nonpublic forum. "First, the government may permissibly restrict content by prohibiting *any* speech on a given topic or subject matter," as long as the restriction encompasses the entirety of the discrete subject. *Byrne*, 623 F.3d at 54–55 (emphasis in original); *see also Perry*, 280 F.3d at 170 ("[T]he government may reasonably restrict expressive activity in a nonpublic forum on the basis of content, but not on the basis of the speaker's viewpoint."). Second, if "the government has permitted *some* comment on a particular subject matter or topic, it may not then 'regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Byrne*, 623 F.3d at 55 (emphasis in original) (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)). Accordingly, the state must be careful to excise the entire matter from the forum, or else it will violate the First Amendment by "den[ying] access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius v. NAACP Leg. Def. Fund*, 473 U.S. 788, 806 (1985).

Several of our sister circuits have grappled with the question of whether excluding speech touching on the issue of abortion constitutes viewpoint

discrimination. The Fourth Circuit dealt with this issue in *Planned Parenthood of South Carolina Inc. v. Rose*, 361 F.3d 786, 794–95 (4th Cir. 2004). There, South Carolina authorized the issuance of a "Choose Life" plate but rejected a plate espousing a pro-choice message. The Fourth Circuit concluded South Carolina engaged in viewpoint discrimination:

> In the license plate forum, South Carolina has authorized the expression of only one position in the abortion debate, thereby promoting the expression of one viewpoint (pro-life) while preventing the expression of the other viewpoint (pro-choice). By granting access to the license plate forum only to those who share its viewpoint, South Carolina has provided pro-life supporters with an instrument for expressing their position and has distorted the specialty license plate forum in favor of one message, the pro-life message. In short, as the district court correctly determined, the Act was adopted because of the State's agreement with the pro-life message. South Carolina has therefore discriminated based on viewpoint.

*Id.* at 795 (citations omitted).

In *Choose Life Illinois*, the Seventh Circuit considered Illinois' refusal to issue a "Choose Life" plate based on the State's explanation that it "has excluded the *entire subject* of abortion from its specialty-plate program; it has authorized neither a pro-life plate nor a pro-choice plate." 547 F.3d at 855 (emphasis in

original). The court concluded that exclusion was a permissible "content-based but viewpoint-neutral restriction," reasoning that:

> Illinois has not favored one viewpoint over another on the subject of abortion or prohibited the display of a viewpoint-specific symbol. Instead, the State has restricted access to the specialty-plate forum on the basis of the *content* of the proposed plate—saying, in effect, "no abortion-related specialty plates, period." This is a permissible content-based restriction on access to the specialty-plate forum, not an impermissible act of discrimination based on viewpoint.

*Id.* at 865 (citations omitted and emphasis in original). We cited *Choose Life Illinois* with approval in *Byrne. See* 623 F.3d at 54–55.

Presented with a similar case in *Arizona Life Coalition Inc. v. Stanton*, 515 F.3d at 971–73 (9th Cir. 2008), the Ninth Circuit reached the opposite conclusion from the Seventh Circuit's *Choose Life Illinois* decision. There, Arizona's License Plate Commission rejected a "Choose Life" plate based on "concerns over whether the general public would believe Arizona had endorsed the message of Choose Life" and on "concerns over whether groups with differing viewpoints would file applications. *Id.*at 961. The Ninth Circuit concluded this constituted viewpoint discrimination rather than a permissible subject matter limitation, relying heavily on the Supreme Court's decision in *Rosenberger v. Rector and*

44

*Visitors of University of Virginia*, 515 U.S. 819 (1995), while acknowledging that "'[t]he line between an acceptable subject matter limitation and unconstitutional viewpoint discrimination is not a bright one.'" *Stanton*, 515 F.3d at 972 (quoting *Cogswell v. City of Seattle*, 347 F.3d 809, 815 (9th Cir. 2003)). In *Rosenberger*, the Court grappled with the constitutionality of the University of Virginia's ban on student activity funding being allocated to support "religious activity," which was defined as any activity that "primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality." 515 U.S. at 825. Categorizing the prohibition as discrimination "against an entire class of viewpoints," the majority criticized the dissent's conclusion that no viewpoint discrimination was afoot as reflecting the "insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech." *Id.* at 831.

We agree with the Ninth Circuit that the line between content-based prohibition and viewpoint-based discrimination can often be hazy. We are, however, hesitant to extend *Rosenberger*'s holding too far beyond the realm of religious speech, lest the category of impermissible viewpoint-based exclusions erode—and possibly subsume—the category of content-based exclusions that would be otherwise permissible in the context of nonpublic forums. The issue of

45

abortion is complex and multi-faceted, to be sure, but a comparison to religion in this context is too attenuated for the rationale underlying the *Rosenberger* Court's holding. The debate regarding abortion is more "bipolar" than that regarding religion, and pro-life and pro-choice speech are much more easily characterized as the predominant response to each other. *See id.* Unlike religion, a person's stance on abortion does not provide "a specific premise, [ ] perspective, [or] standpoint from which a variety of subjects may be discussed and considered," and unlike in *Rosenberger*, New York's custom plate regime does not target a "prohibited perspective," but rather the general subject matter of abortion. *Id.* We therefore join the Seventh Circuit, and depart from the Ninth Circuit, in concluding that the Department's rejection of CFF's proposed custom license plate is a permissible content-based restriction imposed in a nonpublic forum, rather than "an impermissible act of discrimination based on viewpoint." *Choose Life Ill.*, 547 F.3d at 865.

This conclusion is consistent with this Court's precedent in *Byrne*, where we favorably cited *Choose Life Illinois*, noting that "the government may permissibly restrict content by prohibiting *any* speech on a given topic or subject matter." *Byrne*, 623 F.3d at 54–55 (citing, *inter alia*, *Choose Life Ill.*, 547 F.3d at 865

46

(the "state may properly exclude[ ] the *entire subject* of abortion from its specialty-plate program" (emphasis in original and internal quotation marks omitted))). Here, New York employed an approach similar to that of Illinois: as the DMV explained, its "decision is not based on the content of the proposed speech, but instead is intended to preserve viewpoint neutrality by insuring that plates issued by the State do not present or support <u>either</u> side." App'x at 441 (emphasis in original).

Unlike South Carolina in *Rose*, New York opted not to open up a forum for debate of the subject of abortion. *See also Sons of Confederate Veterans*, 288 F.3d at 622–23 (finding viewpoint discrimination where legislation specifically prohibited one group's logo). Whereas South Carolina impermissibly limited the forum to one viewpoint, *see Rose*, 361 F.3d at 793–98, New York did just the opposite. Here, the DMV rejected both pro-choice ("RU486") and pro-life ("Choose Life") license plates. The DMV cited the same policy when it denied a "Choose Life" custom plate application in 1998 as it did when it later repeatedly denied CFF's application, thus evincing a standard practice of excluding custom plates pertaining to the subject of abortion for safety reasons. The DMV's denial of CFF's proposed "Choose Life" custom plate therefore constitutes the

47

application of a permissible subject-matter based restriction imposed in a nonpublic forum and does not constitute viewpoint discrimination.

## 2. Reasonableness

The reasonableness of a restriction "turns on the 'purpose of the forum and all the surrounding circumstances,' and to survive First Amendment scrutiny the restriction 'need not be the most reasonable or the only reasonable limitation' imaginable," it must only be reasonable. *Byrne*, 623 F.3d at 59 (citation omitted) (quoting *Cornelius*, 473 U.S. at 808-09). As long as the rationale is "consistent with a legitimate government interest," the restriction will not run afoul of the First Amendment. *Id.* at 59-60.

The DMV asserts that its restriction in this case serves two interests: (1) to limit the potential for violence on the State's roads (*i.e.*, road rage); and (2) to avoid the perception that the State endorses one side of a contentious political issue. Both interests are manifestly legitimate, and we discuss the reasonableness of the DMV's actions to further each interest in turn.

Excluding a highly charged topic—one which in our nation's recent history has driven people to violent behavior, including bombings and murder—from an environment set aside for the use of countless multi-ton

48

vehicles traveling at high rates of speed where thousands of deaths occur each year, is consistent with the government's interest in safety. CFF's contention that "Choose Life" plates have been available for purchase in other states for twelve years with no definitive proof of ill effects, does not render unreasonable New York's decision. At the time CFF sought approval for the plates, the abortion debate was particularly volatile, and the DMV was aware of violent protests and bombings at abortion clinics. Given the "purpose of the forum and all the surrounding circumstances," *Byrne*, 623 F.3d at 59 (internal quotation omitted), and contrary to the dissent's implication, we see no reason why the DMV, serving the legitimate interest of highway safety, must demonstrate that "Choose Life" plates have already incited roadway violence.

Pointing to several other custom plates that were approved and that it claims pertain to comparably controversial issues, CFF argues that the rejection of its proposed plate was unreasonable because the Department was not consistent in banning "controversial" expressions, which "unquestionably allow[ed] for viewpoint discrimination." Appellee's Br. 18. That argument does not hold water. As Deputy Commissioner Dunn testified, the subject of abortion:

[is] so incredibly divisive across the country, that [it] is not similarly situated to an organization seeking a "Union Yes" plate. . . . [F]or a government agency to issue a "Union Yes" plate is not going to invoke the violence or outrage that would be provoked if a government agency were to issue . . . a license plate [on this] highly divisive issue.

App'x at 1364. Although reasonable minds may differ when weighing and comparing the controversial nature of the various political issues of our day, it is undisputed that abortion is among the most hotly and passionately contested. We cannot conclude that the DMV acted unreasonably when it decided that abortion was unique among the issues that CFF claims to be "similarly situated." App'x at 441.

We turn now to the State's interest in avoiding the perception that it supports one side of a controversial subject (i.e., maintaining viewpoint neutrality). In *Perry*, we held that Vermont had a legitimate interest in rejecting plaintiff's request for a "SHTHPNS" vanity plate because the government was attempting to avoid being associated with "offensive" words like "shit." *Perry*, 280 F.3d at 169 ("The state has a legitimate interest in not communicating the message that it approves of the public display of offensive scatological terms on state license plates."). As Commissioner Jackson stated when he rejected a plate

supporting restoration of the grey wolf in the Adirondacks, "[l]icense plates were not meant to be bumper stickers for causes" with the government's imprimatur attached. App'x at 1666. The DMV advised CFF that if the organization found a way to display a message that "is both directly related to its own mission [i.e., adoption] and unrelated to the controversial issue[]" of abortion, it would reconsider the application. App'x at 410. CFF declined to make the change from "Choose Life" to "Choose Adoption" in all three of its applications. The DMV acted reasonably in rejecting an application advocating one side of a controversial topic that it did not want to be perceived as endorsing, while providing CFF a reasonable alternative that would still communicate the message CFF purports to advance.

Moreover, individuals retain the ability to speak on the topic of abortion regardless of the DMV's denial. *See Perry*, 280 F.3d at 169–70. For example, people may display a "Choose Life" bumper sticker—or even cover every available square inch of their vehicle with such stickers. That message will resonate just as loudly as if the vehicle displayed a "Choose Life" license plate. It will merely do so without the perception of State endorsement.

In sum, we will not disturb the Department's decision to reject a "Choose Life" custom plate, which was made pursuant to a subject matter-based, but viewpoint neutral policy, to exclude the entire subject of abortion from the nonpublic forum of State-issued license plates. The decision was consistent with the State's legitimate interests in keeping its roadways safe and avoiding the appearance of State endorsement. CFF's as-applied challenge fails.

## II. Due Process & Equal Protection Claims

CFF also claims that New York's custom plate regime violated its Fourteenth Amendment rights under the Equal Protection and Due Process Clauses. The district court did not reach these arguments, which we now reject. CFF claims that its Fourteenth Amendment rights were violated because the DMV's decision to allow some groups to voice their opinions, while not affording CFF the same opportunity, constitutes "invidious discrimination" forbidden under the Equal Protection Clause. Appellee Br. 56–60. Likewise, it claims that the exercise of the Commissioner's discretion amounted to discriminatory exclusion under the Due Process Clause. These conclusory statements do nothing to identify a constitutional harm. *See D'Elia v. N.Y., New Haven & Hartford R.R.*, 338 F.2d 701, 702 (2d Cir. 1964). They simply amount to

the First Amendment arguments that we have rejected, reframed in terms of equal protection and due process violations. CFF's claim "fares no better in [this] garb." *Perry Educ. Ass'n*, 460 U.S. at 54. The First Amendment provides the "explicit textual source of constitutional protection" here, rather than some generalized constitutional theory of equal protection or substantive due process. *Catletti ex rel. estate of Catletti v. Rampe*, 334 F.3d 225, 229 (2d Cir. 2003) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998)). The First Amendment is thus the appropriate yardstick by which to measure the constitutionality of the DMV's custom license plate program. *Accord Graham v. Connor*, 490 U.S. 386, 395 (1989) (stating that where the Fourth Amendment was the "explicit textual source of constitutional protection," as opposed to a more generalized notion of due process, that Amendment must guide the Court's analysis).

**CONCLUSION**

We conclude that New York's custom license plate program, either on its face or as applied in this case, does not violate the First Amendment. We therefore REVERSE the district court's judgment, and REMAND this case to that court to enter judgment in favor of defendant-appellant.

The mandate in this case will be held pending the Supreme Court's decision in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 752 (U.S. Dec 05, 2014). Should any party believe there is a need for the district court to exercise jurisdiction prior to the Supreme Court's decision, it may file a motion seeking issuance of the mandate in whole or in part. Although any petition for rehearing should be filed in the normal course pursuant to Federal Rule of Appellate Procedure Rule 40, this Court will not reconsider its opinion until after the Supreme Court's decision in *Walker*. The parties will have until fourteen days following the date the Supreme Court's decision is filed to file supplemental petitions for rehearing in light of *Walker*.

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

New York's Commissioner of Motor Vehicles, citing his sole control over the issuance of custom license plates in the State of New York, deems a proposed custom plate depicting a sun and two smiling children, and bearing the words, "Choose Life," to be "patently offensive," and thus prohibited under New York law. In its desire to uphold this surprising result, the majority downplays the broad discretion afforded to the Commissioner, perceives content in a regulation without it, and divines a long-standing practice from trivial and contradictory evidence. The majority effectively shields New York's custom plate program from judicial review and does so in a manner out of line with our precedent and with similar cases from around the country. Because I would find that New York State's custom plate program places no meaningful limit on the Commissioner's discretion, thereby inviting viewpoint discrimination, I respectfully dissent.

**I.**

Since 1977, New York has empowered its Commissioner of Motor Vehicles to issue "special number plates" in accordance with Department of Motor Vehicle regulations. *See* N.Y. VEH. & TRAF. LAW § 404 ("section 404"). Section 404 lodges the decision to issue such plates solely with the Commissioner, providing that

1

"[n]othing contained in [the statute] shall be construed to require the [C]ommissioner to issue a special number plate or plates." *Id.* 404(4); *see also id.* 404(1) ("The [C]ommissioner *may* issue special number plates . . . ." (emphasis added)). Beyond minimal fee requirements, the Commissioner's discretion in issuing the plates is impacted by only one regulation, 15 N.Y.C.R.R. § 16.5, which states in relevant part that "[n]o plate shall be issued . . . which . . . is, in the discretion of the [C]ommissioner, obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive." *Id.* §16.5(e).[1] The interpretation of these terms, as noted in the regulation, is entrusted to "the discretion of the [C]ommissioner." *Id.* Thus, by their plain terms, section 404 places no limit on the Commissioner's discretion in reviewing applications for special number plates, and 15 N.Y.C.R.R. § 16.5 places at most a modest one, requiring the

---

[1] 15 N.Y.C.R.R. § 16.5 states in full that:

> No plate shall be issued under this Part which: (a) does not have at least one letter. This provision shall not apply to plates issued to public officers; (b) has numbers and letters, or any combination thereof, arranged in a format reserved for issuance to specific classes of vehicles other than passenger vehicles; (c) is assigned for issuance to historical motor vehicles; (d) consists of six numbers followed by one letter; (e) is, in the discretion of the commissioner, obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive; or (f) would lead one to believe that the owner of a particular vehicle is connected with or operating in an official capacity for a governmental organization or function.

2

Commissioner to deny applications that he determines run afoul of the regulation. The Commissioner's discretion to approve applications is unlimited beyond the scope of 15 N.Y.C.R.R. § 16.5, and his discretion to deny applications is entirely unbounded.

In 1992, in a bid to generate additional revenue, the New York State legislature amended section 404 to approve the sale of "distinctive regional design plates." N.Y. VEH. & TRAF. LAW § 404-*l*. Though the Department had long issued individual "vanity" plates and other plates specifically authorized by statute, the Commissioner relied on this amendment to institute the large-scale custom plate program at issue here. Dubbed "Take Your Pride for a Ride," the program authorizes the issuance of custom license plate series on the application of non-profit organizations that are registered in New York and fall within eight broad categories: (1) Sports Teams; (2) Causes; (3) Organizations; (4) Counties and Regions of New York; (5) Colleges, Fraternities, and Sororities; (6) Military and Veterans; (7) Emergency Services; and (8) Professions. To apply, an organization is required to submit a description of itself and its cause, a refundable deposit sufficient to finance the initial manufacturing costs, a plate design, and marketing materials. No statute or regulation specific to the program guides the Commissioner's

3

implementation of the program or provides objective criteria for his review of applications. *See id.* 404-*l*(1) (providing for issuance of "license plate[s] with a distinctive regional design approved by the [C]ommissioner"). Instead, only 15 N.Y.C.R.R. § 16.5 – in relevant part, prohibiting a subset of plates deemed "obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive" – applies.

From 1992 to 2004, when the Department suspended the program, the program issued dozens of custom plate series, spanning topics as diverse as sports, pets, recycling, Freemasonry, the legacy of Theodore Roosevelt, motorcycle and luxury car ownership, horse racing, military service, and professional memberships. Notably, the Commissioner approved plates for both "Cop Shot," an organization providing monetary rewards for information concerning officers harmed in the line of duty whose custom plate depicts a blood splatter, a cross-hair, and the words "SUPPORT POLICE," and the "Union Yes" campaign, with three separate pro-union plates promoting the New York State AFL-CIO, New York State United Teachers union, and unions generally.

Despite the broad array of messages approved for inclusion in the program, the Commissioner thrice rejected Children First Foundation, Inc.'s ("CFF")

4

application for a "Choose Life" plate series. CFF first applied to the program in December 2001, proposing a plate with the image of two smiling children, drawn in crayon, positioned over the phrase "Choose Life." Though CFF complied with the program's application requirements, the Commissioner denied its proposed plate in February 2002. The only reason provided for the denial was that the Department had rejected a similar "Choose Life" plate in 1998. After CFF requested a fuller explanation, the Department replied that the proposed plate had been deemed "patently offensive," in contravention of 15 N.Y.C.R.R. § 16.5(e). In support of this assertion, the Department cited its purported – albeit, unwritten – practice of avoiding association with "*either* side" of a "political, religious[,] or social issue that has proven to be . . . contentious and divisive."[2] J.A. 409. The Department averred that notwithstanding CFF's "laudable" pro-adoption goals, CFF's "Choose Life" slogan is "more commonly associated with the abortion rights debate" than the issue of adoption, triggering the ban on "patently offensive" plates. The Department also cited a purported risk of "road rage" should the plates be released to the public, as

---

[2] The Department's account of this "practice" has shifted during this litigation. While the Department cited only a ban on "contentious" messages in its letter to CFF, in a subsequent affirmation, the Deputy Commissioner and Counsel for the Department described the practice as only approving applications that "refrain[ed] from espousing *an[y]* particular religious, political or social position" (emphasis added). J.A. 1663.

5

well as a concern that the "Choose Life" plate series "would readily be perceived as governmental support for one side of a controversy that has existed in this country for several decades."[3]  J.A. 409.

In October 2003, CFF submitted a redesigned plate for consideration. Though the plate, for the first time, promoted the website "Fund-Adoption.Org," it retained the "Choose Life" slogan. CFF stated in its application that the slogan was necessary to appeal to pro-adoption, pro-life, and anti-death penalty advocates alike.  The Commissioner again rejected the proposed plate on the basis of the alleged policy against "contentious" messages and, in an apparent effort to emphasize the finality of the denial, cited to CFF his "sole[]" "control over the design, marketing, and issuance of any custom plate series," as well as the lack of any "legal requirement" obliging him to approve applications.  J.A. 439.  CFF submitted another redesigned plate in 2004 but the Commissioner deemed CFF's application already denied.  He suspended the custom plate program altogether shortly thereafter.

---

[3] Prior to the Commissioner's denial of CFF's custom plate applications, the Department had issued several vanity plates to individuals associated with CFF and bearing messages such as "CHSE LFE."  In addition, at the time the Commissioner denied CFF's third and final application, at least eleven other states offered custom "Choose Life" plates.  *See* Choose Life America, Inc., *Newsletter*, http://www.choose-life.org/ newsletter.php (last visited April 18, 2015).  In his deposition, the Commissioner admitted that he could not recall a single instance of road rage spurred by a custom plate.

6

Though the Department has denied four "Choose Life" plates pursuant to its alleged policy deeming so-called "contentious" license plates to be "patently offensive" (namely, CFF's three submissions and the 1998 application), the Department points to only one other custom plate application barred by this asserted policy: a "Restore the Wolf" plate supporting repopulation of the Eastern timber wolf in the Adirondacks.

## II.

Before addressing the constitutionality of New York's custom plate program, it is necessary to determine the type of speech and forum at issue. I, along with the majority and nearly every circuit to consider a similar program, conclude that the speech is private and the forum nonpublic. *See, e.g.*, *Byrne v. Rutledge*, 623 F.3d 46, 53-54 (2d Cir. 2010); *Perry v. McDonald*, 280 F.3d 159, 169 (2d Cir. 2001); *Ariz. Life Coal. Inc. v. Stanton*, 515 F.3d 956, 970-71 (9th Cir. 2008); *Choose Life Ill., Inc., v. White*, 547 F.3d 853, 864-65 (7th Cir. 2008). Both the purpose of the program and the speakers involved compel a finding that the custom plates communicate private speech. The program permits non-profit organizations the opportunity to convert license plates into "'mobile billboard[s]'" to promote their message while raising revenue for their cause. *See Choose Life Ill., Inc.*, 547 F.3d at 862 (quoting *Wooley v.*

7

*Maynard*, 430 U.S. 705, 715 (1977)). The fact that the message is imparted on government property does not override its private provenance. While a government official must approve the custom plates, nonprofit organizations propose and design them, and vehicle owners choose to display them on their cars. *See Choose Life Ill., Inc.*, 547 F.3d at 863-64. Because "Take Your Pride for a Ride" therefore implicates private and not government speech, the strictures of the First Amendment apply. *See Ariz. Life Coal. Inc.*, 515 F.3d at 963. Further, though the program permits an array of speech, both the quantity of that speech (the text that can fit on a license plate) and access to the program (with all license plate designs requiring approval by the Commissioner) are limited. Because New York did not thus intend to open its custom plate program to "general public discourse and debate," it created a nonpublic forum, permitting more stringent regulation of speech. *See Choose Life Ill., Inc.*, 547 F.3d at 864-65.

At this point in the analysis, however, the majority and I diverge. Confronted with an utterly standardless regime that interprets "patently offensive" to mean "contentious" – and that then deems a "Union Yes" plate benign and "Choose Life" and wolf repopulation plates "especially" controversial – the majority concludes that adequate standards guide the Commissioner's discretion. Maj. Op. at 40. In light

8

of our contrary precedent and the utter malleability of the regulatory regime at issue, I cannot agree.

*   *   *

The danger of content and viewpoint discrimination in violation of First Amendment rights "is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988); *see Roach v. Stouffer*, 560 F.3d 860, 869 (8th Cir. 2009) (discussing this danger in the context of a custom license plate program). Accordingly, where a licensing restriction lacks "'narrow, objective, and definite standards to guide the licensing authority,'" it may be deemed unconstitutional on its face. *Amidon v. Student Ass'n of State Univ. of N.Y.*, 508 F.3d 94, 103 (2d Cir. 2007) (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). This principle protects against two relevant risks: first, self-censorship by "timid speakers who are worried that officials will discriminate against their unorthodox views," and second, that lacking governing standards, a government official may "suppress viewpoints in surreptitious ways that are difficult to detect." *Id.* at 103-04. In either scenario, the opportunity for meaningful judicial review is virtually nil. *Id.*

9

I agree with the majority that the prohibition against unbridled discretion applies to a nonpublic forum. Maj. Op. at 27. This is because "the dangers posed by unbridled discretion—particularly the ability to hide unconstitutional viewpoint discrimination—are just as present" in these fora. *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch*s., 457 F.3d 376, 386 (4ᵗʰ Cir. 2006). Thus, while government officials may be accorded greater latitude in restricting access to such fora, policies that "permit[] officials to deny access for any reason, or that do[] not provide sufficient criteria to prevent viewpoint discrimination" nonetheless contravene the First Amendment. *Id.* at 387. The instant case illustrates the wisdom of this principle.

The custom plate program here, including the relevant statute, regulation, and supposed historical practice, lack any "narrow, objective, and definite standards" to guide official discretion. *See Amidon*, 508 F.3d at 103. The Commissioner may indiscriminately pick and choose among applicants for custom plates, despite having opened the program broadly to any non-profit organization representing, *inter alia*, a "Cause." Because the regime at issue thus lacks criteria sufficient to prevent viewpoint discrimination, the scheme is facially unconstitutional. *See Lewis v. Wilson*, 253 F.3d 1077, 1080 (8th Cir. 2001) (striking down custom plate program

10

that permitted officials to reject applications that were "contrary to public policy" because "there was nothing in the ordinance to prevent [government officials] from denying . . . plate[s] because of [the applicant's] viewpoint"). I reach this conclusion for the following reasons.

First, as discussed above, the statute. Section 404 places literally no limit – objective or otherwise – on the Commissioner's discretion in reviewing applications, save for a requirement that he collect annual fees. *See* N.Y. VEH. & TRAF. LAW § 404. Instead, section 404 provides only that the Commissioner "may" approve applications and expressly provides that "[n]othing contained in [section 404] shall be construed to require the [C]ommissioner to issue a special number plate or plates."[4] *Id*. § 404(1), (4). Thus, the statute by its plain terms rejects the notion that it may, in any way, be construed to limit the Commissioner's unfettered discretion over the program.

Further, while the Commissioner contends that 15 N.Y.C.R.R. § 16.5(e) limits his freewheeling discretion, the regulation in fact does nothing of the sort. As an initial matter, the regulation (along with the Commissioner's purported historical

---

[4] Section 404-*l*(1) similarly provides merely for the issuance of custom plates bearing designs "approved by the [C]ommissioner" without specification of any standards for approval. N.Y. VEH. & TRAF. LAW § 404-*l*(1).

11

practice pursuant to this regulation of denying "contentious and divisive" plates as "patently offensive") merely delineates a subset of plates that the Commissioner *cannot* issue. Section 16.5(e) and associated practice pursuant to it offer no direction whatsoever for applications deemed to fall *outside* the regulation's scope. In effect, then, the Commissioner has discretion to deny applications pursuant to 15 N.Y.C.R.R. § 16.5(e) and his practice under that provision *or for any other reason he desires*. As the Commissioner himself stated in his letter to CFF, he retains "sole[ ]" "control over the . . . issuance of any custom plate series" and is under no "legal requirement" to approve any application. J.A. 439.

Consideration of the license plate applications supposedly falling *within* the scope of 15 N.Y.C.R.R. § 16.5(e), moreover, does nothing to alleviate the infirmities of this standardless regime. Section 16.5(e) is the *only* legal constraint on the Commissioner's discretion over custom plate applications relevant here, yet the regulation merely directs that the Commissioner not issue plates that are, "in [his] discretion[,] . . . , obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive." 15 N.Y.C.R.R. § 16.5(e). We may assume *arguendo* that the prohibitions on plates that are "obscene, lewd, lascivious, [and] derogatory to a particular ethnic or other group" provide adequate content to guide the

12

Commissioner's decisions, for these terms are not at issue. The term "patently offensive," however – the term that *is* at issue, because it is the term on which the Commissioner relies in defending his decision to deny CFF's application – is, as the Supreme Court has said, *inherently vague and open-ended*. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 873 (1997). And for this reason, the Supreme Court has concluded that a prohibition on "patently offensive" speech must be limited in some manner to address First Amendment concerns. *See id.* at 873-74.

Section 16.5(e) contains no such limitation. At base, 15 N.Y.C.R.R. § 16.5(e) and its bar on "patently offensive" material is a metric for *any* content deemed objectionable by the Commissioner, imposing no discernible limit on his decision-making process. The regulation is therefore "too vague and pliable to effectively provide the constitutional protection of viewpoint neutrality." *See Amidon*, 508 F.3d at 104; *see also Ariz. Life Coal., Inc.*, 515 F.3d at 973 (striking down Arizona's custom plate program and noting the "potential constitutional problems when government officials are given unbridled discretion in regulating speech, even in limited public fora").[5]

---

[5] Notably, two recent decisions have struck down custom plate programs for relying on similarly vague language. *See Matwyuk v. Johnson*, 22 F. Supp. 3d 812, 824 (W.D. Mich. 2014) (striking Michigan's custom plate program because the program's bar against plates that were "offensive to good taste and decency" "lack[ed] objective criteria, and thus

Perhaps the majority is willing to go with me this far. It admits "that [the statute and regulation] afford the commissioner broad discretion" and even concedes that "[t]he ability of [the statute and regulation]—standing alone—to provide an adequate safeguard against the Commissioner's exercise of unbridled authority is dubious." Maj. Op. at 30. I could not agree more. If this is actually the majority's position, then our disagreement is confined to whether or not the Commissioner's supposed policy of denying applications on the basis of "controversial" or "inflammatory" subject matter constitutes a "well-established" and "uniformly applied" practice that has assumed the force of law and cabined his discretion. However, the majority shifts position from page to page – thus pronouncing its disagreement with CFF's stance that "the statute . . . do[es] not adequately bridle the Commissioner's discretion" after itself admitting as much nine pages earlier. Maj. Op. at 39. The majority also defends the overall structure of the New York regime, which limits the Commissioner's ability to *grant* certain applications, but permits him to *deny* one for any reason.[6] Maj. Op. at 39-40. Most

confer[red] unbounded discretion on the decisionmaker"); *Montenegro v. N.H. Div'n of Motor Vehicles*, 93 A.3d 290, 298 (N.H. 2014) (striking down vanity license plate regulation prohibiting plates that are "offensive to good taste" as unconstitutionally vague).

[6] The majority, citing the Supreme Court's decision in *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), and this Court's decision in *Perry*, deems the "permissive nature of the relevant statutory and regulatory provision (*i.e.*, that the Commissioner 'may' issue custom

pertinent here, moreover, and despite acknowledging that "the constraints [placed] on the Commissioner" by 15 N.Y.C.R.R. § 16.5(e) are "modest" at best, the majority nonetheless concludes that these constraints "are sufficient to bridle his or her discretion and thus to pass Constitutional muster." Maj. Op. at 39. Before addressing the majority's claim that a well-established and uniformly enforced policy of denying "politically sensitive" and "emotionally charged" custom plate applications "render[s] the Commissioner's discretion adequately bridled," Maj. Op. at 35, then, I elaborate on my reasons for finding 15 N.Y.C.R.R. § 16.5(e) itself so wanting.

As I have already explained, a prohibition on "patently offensive" speech, without further definition or elaboration, lacks sufficient content to satisfy First

---

plates but is never required to do so)" irrelevant. Maj. Op. at 39-40. But neither the park ordinance at issue in *Thomas* nor the Vermont vanity plate provision addressed in *Perry* permitted a government official to prohibit speech, as here, in his or her unfettered discretion. The ordinance in *Thomas*, which required individuals to obtain a permit before conducting large-scale events in public parks, limited the Park District's authority to deny a permit to thirteen specified grounds and, as interpreted, permitted the District to waive inadequacies in an application only when doing so would "do no harm to the policies furthered by the application requirements." 534 U.S. at 324-25. Similarly in *Perry*, we recognized that a Vermont vehicle owner at the time was entitled to a vanity plate for an additional fee "as long as the requested combination of letters and/or numbers [met] certain [specified] criteria." 280 F.3d at 163. While a requested plate could be denied if "offensive or confusing to the general public," Vermont, unlike New York, enumerated specific definitions of "offensive" or "confusing" – seven specific definitions, to be precise – to channel its officers' discretion. *Id*. at 172 n.9. Thus, neither *Thomas* nor *Perry* is apposite.

Amendment concerns. *Reno*, 521 U.S. at 870-71. The majority argues, to the contrary, that "patently offensive"is a familiar term to those in the legal profession, with a readily discernable meaning. Maj. Op. at 39. To the extent this is so, however, such meaning is derived from statutes and regulations that employ the term to refer to certain sexual and excretory content and not to core political expression such as is embodied in CFF's proposed plate depicting smiling children and bearing the message, "Choose Life."[7] *See, e.g.*, *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 732 (1978). In the principal cases interpreting "patently offensive," moreover, the phrase has been textually limited to such sexual or excretory content, with the bounds of the phrase clearly delimited by the language of the statute or regulation. *See Reno*, 521 U.S. at 873 (noting that the test prescribed by *Miller v. California*, 413 U.S. 15, 24 (1973), "reduce[d] the vagueness inherent in the open-ended term 'patently offensive'" by requiring that the material deemed "patently offensive" be "specifically defined by the applicable state law"); *see also Denver Area Educ. Telecomm. Consortium v. F.C.C.*, 518 U.S. 727, 732-33 (1996) (upholding statute that

---

[7] It is notable – and ironic – that the majority is willing to permit the Commissioner to rely on a phrase typically used to prohibit only the most peripheral speech under the First Amendment to instead suppress core political expression. *Compare F.C.C. v. Pacifica Found.*, 438 U.S. 726, 746 (1978) (deeming vulgar utterances to be of "slight social value"), *with McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (noting that advocacy of political beliefs is "the essence of First Amendment expression").

16

permitted cable operators to block content that they "reasonably believe[d] describe[d] or depict[ed] sexual or excretory activities or organs in a patently offensive manner" (internal quotation mark omitted)); *see Pacifica Found.*, 438 U.S. at 732 (permitting regulation of content that "describe[d], in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs").

No such explicit textual limit exists here: 15 N.Y.C.R.R. § 16.5(e) applies to *all* "patently offensive" material, even that outside of the sexual and excretory field. Neither can the canon of *noscitur a sociis* limit the reach of 15 N.Y.C.R.R. § 16.5(e). Although "obscene, lewd, [and] lascivious" suggest reference to sexual content, the inclusion of the phrase "derogatory to a particular ethnic or other group" in the list destroys any commonality that the prohibitions might otherwise have shared. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (stating that, pursuant to the canon of *noscitur a sociis*, a word must be judged by the "company it keeps"); *Harris v. Allstate Ins. Co.*, 309 N.Y. 72, 76 (1955)(same). I therefore see no textual way to limit the regulation to this meaning. And apparently the Commissioner sees none either, as he interprets "patently offensive" to cover speech regarding any "political, religious[,] or social issue" that he deems "contentious and divisive." J.A. 409.

17

The majority attempts to distinguish the Eighth Circuit's holding in *Roach v. Stouffer* from the instant action. Maj. Op. at 38. There, the court struck a portion of Missouri's custom plate program that permitted a legislative committee to rule on applications because there were "no standards or guidelines whatsoever" to guide the committee's discretion. *Roach*, 560 F.3d at 869. Seizing on this language, the majority insists that *Roach* is inapposite because 15 N.Y.C.R.R. § 16.5(e) provides some limit to the Commissioner's discretion. But the test of unbridled discretion is not whether *any* limit has been placed on official discretion, but whether that limit is "adequate." *See Thomas*, 534 U.S. at 323 (2002); *Child Evangelism Fellowship of MD, Inc.*, 457 F.3d at 384. And the majority's insistence that an adequate legal limit may be divined from the term "patently offensive" as used in 15 N.Y.C.R.R. § 16.5(e) is belied by the Supreme Court's recognition in *Reno* that "patently offensive" alone lacks sufficient content to stanch First Amendment concerns.[8] *Reno*, 521 U.S. at 870-71.

---

[8] To the extent the majority is attempting to impose its own construction of "patently offensive" onto 15 N.Y.C.R.R. § 16-5(e) to salvage New York's custom plate program, moreover, "a federal court cannot supply a binding construction of a state or local ordinance[;] the limiting construction . . . must come, if at all, from the [state agency] or a state court." *See Beal v. Stern*, 184 F.3d 117, 127 n.7 (2d Cir. 1999).

18

That brings us to the Department's purportedly well-established practice of declining to issue plates on "*either* side" of a "political, religious[,] or social issue that has proven to be . . . contentious and divisive." J.A. 409. The majority attempts to distinguish *Roach* on this ground as well, by stating summarily that not only the regulation, but "the DMV's well-established and consistently applied policy and practice provide the guidelines that were lacking [there]." Maj. Op. at 38. But this argument, too, is insubstantial. At the start, any practice pursuant to 15 N.Y.C.R.R. § 16.5(e) speaks only to those applications the Commissioner *must* deny and not to his broad discretion to deny other applications for any reason whatsoever. But even if this were not the case, a limiting practice not to be found in the text of the relevant statute or regulation may serve as a narrowing construction only when such practice is "well-understood and uniformly applied" such that it has taken on "virtually the force of a judicial construction." *City of Lakewood*, 486 U.S. at 770 n.11. There is nothing in this record – nothing – beyond the Commissioner's self-serving statements to support the conclusion that such a practice is present in this case.

First, the Department itself lacks a coherent understanding of the scope of its supposed practice. While the Commissioner stated in his letter to CFF that the practice bars "contentious" speech on political, religious, and social issues, his

19

Deputy Commissioner and Counsel described the practice as banning *all* applications that espouse a "religious, political or social position," whether or not these positions are controversial or divisive. J.A. 1663. The majority disregards the Commissioner's deputies, reassuringly (albeit unconvincingly) intoning that the Commissioner's practice under 15 N.Y.C.R.R. § 16.5(e) is "not a black box," but is robustly "transparen[t]." Maj. Op. at 36. It was wise to sweep the deputies under the rug. For the deputies' description of a supposedly well-understood practice of denying applications that espouse *any* political or social position would doubtless be a source of bemusement to many New Yorkers, particularly those lucky enough to drive vehicles with custom license plates *approved* by the Commissioner and espousing "political [and] social position[s]" in favor of such varied topics as recycling, horse racing, and the ideals of Martin Luther King, Jr.

It is bad enough that the Commissioner and his deputies cannot consistently describe the supposedly "well-understood and uniformly applied practice," *see City of Lakewood*, 486 U.S. at 770 n.11, on which they rely to lend content to the concept of "patently offensive." Equally damning, however, the Commissioner's supposedly uniform practice of denying "controversial" custom plate applications pursuant to his purported "policy" is limited to the spurned "Choose Life" and

20

"Restore the Wolf" plates. The Commissioner's denial of two plates on two narrow topics, in light of his approval of dozens of other designs and the evident contradictions in the record as to just what his policy is, hardly give rise to a well-established practice sufficient to provide the public with notice of the parameters of the program. In fact, on this record, it appears that the Department's only well-established practice is to reject license plates bearing the phrase "Choose Life."

The majority attempts to shore up the "well-established" nature of this practice by pointing to the Commissioner's denial of one vanity plate deemed patently offensive, with the message "RU486." Maj. Op. at 32. At the start, the sole support for the proposition that the "RU486 " plate was denied pursuant to this particular policy comes from the Commissioner's deposition – meaning there is no contemporaneous documentary evidence cited to corroborate this claim. Regardless, even assuming that this denial is properly considered to stem from the alleged policy banning controversial speech, it does not affect the analysis. Given the dozens of custom plate series approved by the Commissioner and the untold number of vanity plates issued (including, tellingly, plates to individuals associated with CFF and bearing messages such as "CHSE LFE") the denial of four sequential

21

"Choose Life" applications, a "Restore the Wolf" plate, and one vanity plate does not a well-established practice make.

Moreover, even if the alleged practice *were* well-established – and it is not – it would still prove too vague to imbue section 404 and 15 N.Y.C.R.R. § 16.5(e) with any content. For indefinite bans on "contentious" or "controversial" subject matter have long been disdained by the courts. *See, e.g.*, *Ariz. Life Coal. Inc.*, 515 F.3d at 972 ("[A] ban on controversial speech may all too easily lend itself to viewpoint discrimination." (internal quotation marks and brackets omitted)); *United Food & Commercial Workers Union v. S.W. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 361 (6th Cir. 1998) ("We believe any prohibition against 'controversial' advertisements unquestionably allows for viewpoint discrimination."); *Planned Parenthood Ass'n v. Chi. Transit Auth.*, 767 F.2d 1225, 1230 (7th Cir. 1985) ("We question whether a regulation of speech that has as its touchstone a government official's subjective view that the speech is 'controversial' could ever pass constitutional muster."). Plainly, such subjective limitations provide little notice to applicants of what speech may or may not be permitted, and too easily allow a ban on "contentious" material to shift into a ban on "unpopular" speech.[9]

---

[9] An article in the record that details the Commissioner's denial of the "Restore the Wolf" plate illustrates this concern. The article states that the idea for the plate originated after

22

The Department's own incoherent practice pursuant to its supposed policy proves the point. *Cf. City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the government's rationale for restricting speech in the first place."); *Lewis*, 253 F.3d at 1080 (finding that government's shifting rationale for rejecting plate applications supported unconstitutionality of program). Despite rejecting the "Choose Life" and "Restore the Wolf" plates on the ground that they were "contentious and divisive," the Commissioner had no trouble approving three separate "Union Yes" plates, along with a custom plate bearing the legend "Support Police" and featuring a cross-hair and blood splatter. The Commissioner argues that there is no inconsistency in these decisions, because abortion and wolf restoration are in a different class, in terms of the societal debate that they provoke. But it will no doubt come as a surprise to many that the national debate over right-to-work

the applicants noticed other "cute" license plates around New York. Residents of the Adirondacks, hunters, interest groups, and local government officials, however, were vocally opposed to the restoration cause, with many expressing their opposition in writing to the Commissioner. Following the denial, the Commissioner explained only that the custom plate program was not intended to "be bumper stickers for causes." J.A. 1666. Of course, the program was created to do precisely that: permit non-profit organizations representing "Causes" to "Take [their] Pride for a Ride." But while it was within the Commissioner's discretion to throw open the doors of the custom plate program to such applicants, the First Amendment forbids him from now indiscriminately approving and denying plates submitted by those who accept his invitation.

laws, municipal labor contracts, public school reform, and union campaign spending has fallen to the wayside – or that a license plate depicting a blood splatter and urging support for law enforcement is devoid of controversy.

The Supreme Court, as *City of Lakewood* reminds, "has long been sensitive to the special dangers inherent in a law placing unbridled discretion directly to license speech . . . in the hands of a government official." *City of Lakewood*, 486 U.S. at 767-68. The majority faithfully intones *City of Lakewood*'s words – noting that courts will read a statute or regulation in light of an unstated practice only when this practice is "well-understood and uniformly applied" so as to have "virtually the force of a judicial construction." Maj. Op. at 28 (quoting *City of Lakewood*, 486 U.S. at 770 n.11). The majority faithfully recites the words, but somehow misses their meaning.

Thus, it argues with regard to the "Union Yes" plates that "there is no basis to conclude that the Department failed to apply [its] policy against creating plates that touch upon contentious political issues" when considering the pro-union designs "as opposed to having applied the policy and merely reaching a different result than it did with the 'Choose Life' plate." Maj. Op. at 33. This, however, is precisely the point: that a policy that takes two issues of similar valence and rejects one while blessing the other thrice over, based on agency employees' subjective

24

views that one is more divisive than the other, self-evidently places no meaningful constraint on the Commissioner's discretion. I do not need to show that the Commissioner failed to *apply* his supposed policy against controversial issues to the three applications for "Union Yes" plates—although, notably, there is no evidence in the record that he did. The problem is that, even applying the policy, the Commissioner was free to grant or deny those applications according to his whim. The majority cautions that "[i]t is not our place to evaluate and weigh the various hot button issues of our time against one another, assigning to each a specific place in the landscape of public debate in this country." Maj. Op. at 33. Indeed, it is not our place – and neither should it be the Commissioner's. The Constitution does not permit it.

At base, the statute, regulation and practice here are so malleable as to defy definition. To be clear, this is not to suggest that limits *cannot* be placed on the content of custom license plates, as our decision in *Perry* makes clear.[10] But the

---

[10] As already noted, we determined in *Perry* that Vermont's statutory ban on "offensive" or "confusing" plates did not grant officials unfettered discretion because the regulation governing the ban "limit[ed official] discretion by specifying content." *Perry*, 280 F.3d at 172. Even the most cursory examination of the Vermont regulation – which prohibited, *inter alia*, "[c]ombinations of letters, or numbers that connote, in any language": "breast, genitalia, pubic area, or buttocks," "any illicit drug, narcotic, intoxicant, or related paraphernalia," "disability status," "race," or "political affiliation," *see id.* at 172 n.9 (quoting VT. CODE. R. 14-050-025 I.(f)), is sufficient to suggest the infirmities in New York's

25

Commissioner may not pick and choose what custom plates to permit, based solely on his subjective judgment regarding the degree to which any given political, religious, or social issue is "inflammatory" at any given time. For nowhere do the statute, regulation, or historical practice prohibit "inflammatory" custom plates. (And, indeed, the Commissioner *approved* "Choose Life"-themed vanity plates before denying CFF's applications, only underscoring the incoherence that this regime permits.)

The scheme fails to provide the "narrow, objective, and definite" restraints demanded by this Circuit's First Amendment jurisprudence. *See Amidon*, 508 F.3d at 103. An application for a license plate supporting the minimum wage, the flat tax, or immigration reform would undoubtedly touch upon the sort of "contentious" "political, religious[,] or social issue" that the Commissioner deems potentially to fall within the scope of 15 N.Y.C.R.R. § 16.5(e). But it would pervert First Amendment principles (and signal too forgiving an attitude on the part of a reviewing court) to uphold a scheme in which the Commissioner could, in his unfettered discretion, deem such an application "patently offensive," as compared to "Support Police" and

standardless ban on "patently offensive" speech.

26

"Union Yes." So, too, for a plate depicting two children, a beaming sun, and bearing the message, "Choose Life."

## III.

Taking the Department at its word, the operation of its custom plate program looks something like this: First, the Commissioner deciphers how a proposed plate's message will be interpreted by public. Then, he determines whether the message is sufficiently "offensive" to merit rejection. To do so, he estimates whether the message will be greeted as "contentious" by members of the public. At no point in this process is the Commissioner guided by objective criteria, nor need he be. As the Commissioner reminded CFF, he retains "sole[]" "control over the . . . issuance of any custom plate series" and is under no "legal requirement" to approve any application.

In sum, New York State has opened a forum for speech and permitted its Commissioner unbridled discretion to censor messages therein, risking self-censorship by applicants and shielding the Commissioner's decisions from any meaningful judicial review. While the legislature might permissibly limit the content permitted on custom license plates, or even the Commissioner if his authority were appropriately constrained, the Commissioner may not do so carte

27

blanche. The current scheme, "involv[ing the] appraisal of facts, the exercise of judgment, and the formation of an opinion, by the licensing authority, [presents a] danger of censorship and of abridgment of our precious First Amendment freedoms [that] is too great to be permitted." *See Forsyth*, 505 U.S. at 131 (internal quotation marks and citation omitted). Accordingly, I would affirm the district court's judgment on the ground that New York State's custom plate program inadequately restrains the Commissioner's authority, and I would enjoin the Department from issuing custom plate series under the program.

\*  \*  \*

I have my doubts that "a regulation of speech that has as its touchstone a government official's subjective view that the speech is 'controversial,'" *Planned Parenthood Ass'n*, 767 F.2d at 1230, could ever result in a practice that is consistent with the First Amendment. *See also Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 548 n.9 (1980) (Stevens, J., concurring) (noting that use of "the 'controversial' nature of speech as the touchstone for its regulation threatens a value at the very core of the First Amendment"). Given my conclusion that New York's custom plate program fails to pass constitutional muster on its face, however,

28

I need not and so do not consider this question further, nor the broader question whether the Commissioner might permissibly deny "Choose Life" plates under some different statutory or regulatory regime.

The majority embraces the Commissioner's claim that it was principally safety concerns that motivated his denial of CFF's plate. The record contains scant (if any) evidence supporting the reasonableness of such concerns. One need cast no aspersion on the Commissioner, however, to realize that the true motivation for his decision is impossible reliably to ascertain, given his free-wheeling authority over the custom plate program. And this returns us to the basis for holding New York's program unconstitutional on its face. As the Supreme Court has said:

> [T]he absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*City of Lakewood*, 486 U.S. at 758. The Court in *Lakewood* warned that without standards to limit discretion in the sensitive First Amendment context, "the

29

licensor's action[s] [are] in large measure effectively unreviewable." *Id.* at 759. That is the case here, and for this reason, I would deem New York's custom plate regime to be unconstitutional on its face.